**THE BROWN LAW FIRM, P.C.**
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-662
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SHUMAKE, Derivatively and on Behalf of DYNAVAX TECHNOLOGIES CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> EDDIE GRAY, MICHAEL S. OSTRACH, STANLEY A. PLOTKIN, ARNOLD ORONSKY, LAURA BREGE, FRANCIS R. CANO, DENNIS A. CARSON, DANIEL L. KISNER, PEGGY V. PHILLIPS, ROBERT JANSSEN, and NATALE RICCIARDI, <br><br> Defendants, <br><br> and <br><br> DYNAVAX TECHNOLOGIES CORPORATION, <br><br> Nominal Defendant. | CASE NO.: <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR: <br><br> (1) BREACH OF FIDUCIARY DUTY; <br> (2) UNJUST ENRICHMENT; <br> (3) ABUSE OF CONTROL; <br> (4) GROSS MISMANAGEMENT; AND <br> (5) CORPORATE WASTE. |

## INTRODUCTION

Plaintiff Michael Shumake ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Dynavax Technologies Corporation ("Dynavax" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Eddie Gray, Michael S. Ostrach, Stanley A. Plotkin, Arnold Oronsky, Laura Brege, Francis R. Cano, Dennis A. Carson, Daniel L. Kisner, Peggy V. Phillips, Robert Janssen, and Natale Ricciardi (collectively, the "Individual Defendants,"

1

and together with Dynavax, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Dynavax, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Dynavax, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.   This is a shareholder derivative action that seeks to remedy wrongdoing committed by Dynavax's directors and officers starting on January 7, 2016 and continuing through the present (the "Relevant Period").

2.   Dynavax is a clinical-stage biopharmaceutical company that purports to discover and develop products in order to prevent and treat infectious and inflammatory diseases.

3.   The Company's flagship product and lead vaccine product candidate is HEPLISAV-B,[1] a Phase 3 investigational adult hepatitis B vaccine designed to provide earlier and higher protection with less dosage than licensed vaccines.

---

[1] Prior to February 2014, upon information and belief, the Company referred to its flagship product as "HEPLISAV." Subsequently, Dynavax used the term "HEPLISAV-B" to refer to the same product, with the Company noting in later SEC filings that HEPLISAV-B is "also known as 'HEPLISAV.'" References to "HEPLISAV" and/or "HEPLISAV-B" in this Complaint refer to the same product unless otherwise indicated.

Verified Shareholder Derivative Complaint

4.      On April 26, 2012, the Company announced that it sought approval of HEPLISAV against infection caused by all known subtypes of hepatitis B virus in adults between 18 and 70 years of age by submitting a Biologics License Application ("BLA") to the Food and Drug Administration ("FDA").  A BLA is a request for permission to introduce, or deliver for introduction, a biologic product into interstate commerce.   Subsequently, Dynavax discussed its plans to transition from a clinical-stage biopharmaceutical company to a commercial operation, despite having no marketable products at the time.

5.      On November 15, 2012, the Company disclosed to the investing public that the FDA's Vaccines and Related Biological Products Advisory Committee (the "VRBPAC") determined that there was insufficient data to support the safe use of HEPLISAV.

6.      On February 25, 2013, the Company announced that it had received a Complete Response Letter (the "2013 CRL") from the FDA concerning its BLA submitted to the FDA for HEPLISAV.  The 2013 CRL stated: 1) HEPLISAV would not be approved for the full adult label of ages 18 through 70 years old without supplementary safety data; 2) that under a restricted-use label, the FDA indicated a willingness to consider approving the vaccine; and 3) in order to receive assurances regarding the quality of HEPLISAV, the FDA requested additional data concerning Dynavax's manufacturing controls and facilities and its process validation program.

7.      On June 10, 2013, the Company announced that it recently had a follow-up meeting with the FDA concerning its BLA for HEPLISAV and, according to the Company, before the FDA would even consider approving HEPLISAV, the FDA would require the Company to conduct additional safety trials.  Further, the FDA even declined to approve HEPLISAV with a restricted-use label.  Dynavax also announced that the Company still needed to resolve its outstanding manufacturing issues with the FDA and to revise its existing BLA accordingly.

8.      In early 2014, the Company finalized the design for a new Phase 3 clinical trial of HEPLISAV-B known as HBV-23, to evaluate the overall safety of this product with respect to clinically

significant adverse events and to address the FDA's concern regarding the size of the HEPLISAV-B safety database. HBV-23 also consisted of a comparison of "head-to-head safety and immunogenicity data" between HEPLISAV-B and Engerix-B, an FDA approved vaccine that has been marketed for years. HBV-23 was completed in October 2015.

9. In the first half of 2016, the Company filed a revised BLA (the "Revised BLA") for HEPLISAV-B with the FDA based on the results of the HBV-23 clinical trial. However, unbeknownst to the investing public, the HBV-23 clinical trial was not properly designed and was not able to produce sufficient information to fully address the FDA's concerns outlined in its 2013 CRL.

10. The truth about the Company's business prospects slowly began to emerge in early September 2016 when Dynavax announced that the FDA pushed back the regulatory approval timeline for HEPLISAV-B and then cancelled an already scheduled meeting with the VRBPAC. During the review process, the FDA requested additional data or information from the Company multiple times.

11. Eventually, on November 14, 2016, the Company announced that it had received another CRL from the FDA (the "2016 CRL"), which indicated that it would not approve the Revised BLA. The 2016 CRL cited concerns about some safety issues seen in the HBV-23 trial of HEPLISAV-B and requested additional clarification regarding those cited concerns.

12. On this news, Dynavax's share price fell $7.05, or 64.65%, to close at $4.10 on November 14, 2016.

13. Because the Company failed to obtain FDA approval of HEPLISAV-B, a $100 million loan agreement it had entered into had to be terminated. The Company was thus required to pay a $1.5 million termination fee.

14. Subsequently, the Company suspended manufacturing of HEPLISAV-B and reduced its global workforce by 38%.

15.     During the Relevant Period, in breach of their fiduciary duties, the Individual Defendants recklessly managed the Company by conducting a clinical trial that was improperly designed and caused the Company to provide incomplete information to the FDA, which resulted in the delay and ultimate suspension of the commercialization of the Company's lead product HEPLISAV-B.

16.     Additionally, in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

17.     Moreover, during the Relevant Period, the Individual Defendants failed to disclose to the investing public that: 1) HBV-23 was not properly designed to fully address the FDA's concerns and issues set forth in the 2013 CRL; 2) there were significant adverse events associated with HEPLISAV-B, including a numerical imbalance in cardiac adverse events; 3) Dynavax failed to provide sufficient information to the FDA concerning specific adverse events of special interest ("AESIs"), the numerical imbalance in a small number of cardiac events in HBV-23, new analyses of the integrated safety data base across different time periods, and post-marketing commitments; 4) a commercial launch of HEPLISAV-B was less imminent than the Company had led investors to believe; 5) HEPISLAV-B's safety profile was not similar or comparable to that of Engerix-B; 6) if the application process were to be prolonged, Dynavax's resources would not be sufficient for the Company to advance the HEPLISAV-B program on its own, which in turn would delay the process, and ultimately lead to the suspension of the manufacturing of HEPLISAV-B; and 7) the Company failed to maintain internal controls.

18.     In light of the Individual Defendants' misconduct, which has subjected Dynavax, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chief Medical Officer ("CMO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in thiscourt (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the $1.5 million fee to terminate the loan agreement, and the $3 million restructuring costs associated with the massive layoff of employees, the

losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

19.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and one of them in the Securities Class Action, and their not being disinterested and/or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.    Diversity jurisdiction is conferred by 28 U.S.C. § 1332.   Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Dynavax.  Plaintiff has been a shareholder of Dynavax common stock since August 2012, and has continuously held Dynavax common stock since then. Plaintiff is a citizen of Illinois.

### Nominal Defendant Dynavax

24.     Dynavax is a Delaware corporation with its principal executive offices at 2929 Seventh Street, Suite 100, Berkeley, California 94710. Dynavax's shares trade on the NASDAQ under the ticker symbol "DVAX."

### Defendant Gray

25.     Defendant Eddie Gray ("Gray") joined Dynavax as Chief Executive Officer and was appointed to the Board in May 2013.   He is a citizen of California.  During the period of time when the price of the Company's stock was artificially inflated, Defendant Gray beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The Company's Schedule 14A filed with the SEC on April 22, 2016 (the "2016 Proxy Statement") | January 29, 2016 | 282,188 |

26.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Gray beneficially owned approximately $6.8 million worth of Company common stock.

27.     The following table summarizes the compensation received by Gray from the Company:

| Fiscal Year | Total Compensation ($) | Salary ($) | Option Awards | All Other Compensation |
|---|---|---|---|---|

| 2016 | 2,947,840 | 600,000 | 2,345,840 | 2,000 |

28.     The Company's 2016 Proxy Statement stated the following about Defendant Gray:

**Eddie Gray – CEO and Director**

Mr. Gray joined Dynavax as Chief Executive Officer and was appointed to our Board in May 2013. Most recently, Mr. Gray served as the President of Pharmaceuticals Europe and a member of the corporate executive team at GlaxoSmithKline plc (GSK) from 2008 until 2013 and as Senior Vice President and General Manager of Pharmaceuticals UK from 2001 through 2007. Prior to the formation of GSK, Mr. Gray was with SmithKline Beecham from 1988 through 2000 serving in various positions of increasing responsibility, including Vice President and Director of Anti-Infectives Marketing in the U.S., Vice President and Director of the Vaccines Business Unit in the U.S., and Vice President and General Manager of Pharmaceuticals in Canada. Our Board believes that Mr. Gray's more than 30 years of pharmaceutical industry experience, including, most recently, as the President of Pharmaceuticals Europe at GSK, a leading pharmaceutical company, and other senior management roles at GSK and its predecessor, where he was responsible for the launch, commercialization and strategic development of vaccines and other products, enables him to provide commercial and strategic leadership to the Company and qualifies Mr. Gray to be nominated as a director. Mr. Gray received a Bachelor of Science degree in Chemistry and Management Studies from the University of London and an MBA from the Cranfield School of Management in the UK.

**Defendant Ostrach**

29.     Defendant Michael S. Ostrach ("Ostrach") joined Dynavax in October 2006 as Vice President, Chief Business Officer and General Counsel, and became Principal Financial Officer in September 2013, Chief Financial Officer in March 2015 and Senior Vice President in February 2016. Mr. Ostrach held the position of Dynavax's General Counsel from October 2006 to September 2015. He is a citizen of California.  During the period of time when the price of the Company's stock was artificially inflated, Defendant Ostrach beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The 2016 Proxy Statement | January 29, 2016 | 134,120 |

30.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Ostrach beneficially owned approximately $3.23 million worth of Company common stock.

31.     The following table summarizes the compensation received by Defendant Ostrach from the Company:

| Fiscal Year | Total Compensation ($) | Salary ($) | Option Awards ($) | All Other Compensation ($) |
|---|---|---|---|---|
| 2016 | 1,130,752 | 425,000 | 703,752 | 2,000 |

32.     The Company's 2016 Proxy Statement stated the following about Defendant Ostrach:

**Michael S. Ostrach – Senior Vice President, Chief Financial Officer and Chief Business Officer**

Mr. Ostrach is our Senior Vice President, Chief Financial Officer and Chief Business Officer. Mr. Ostrach joined Dynavax in October 2006 as Vice President, Chief Business Officer and General Counsel, and became Principal Financial Officer in September 2013, Chief Financial Officer in March 2015 and Senior Vice President in February 2016. Mr. Ostrach held the position of Dynavax's General Counsel from October 2006 to September 2015. From 2005 to 2006, he was Chief Operating Officer, Chief Financial Officer and General Counsel at Threshold Pharmaceuticals. From 1997 to 2004, Mr. Ostrach was at Kosan Biosciences, most recently as President and Chief Operating Officer. Mr. Ostrach began his corporate career at Cetus Corporation, where he served in several capacities between 1981 and 1991, initially as General Counsel and finally as Senior Vice President of Corporate Affairs and General Counsel. Following the acquisition of Cetus by Chiron Corporation in 1991, Mr. Ostrach became President of Chiron Technologies. He holds a B.A. from Brown University and a J.D. from Stanford Law School.

**Defendant Janssen**

33.     Defendant Robert Janssen ("Janssen") has served as the Company's Chief Medical Officer and Vice President, Clincial Development and Regulatory Affairs since July 2013.  He is a citizen of California.  During the period of time when the price of the Company's stock was artificially inflated, Defendant Janssen beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The 2016 Proxy Statement | January 29, 2016 | 50,221 |

34.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Janssen beneficially owned approximately $1.2 million worth of Company common stock.

35.     The following table summarizes the compensation received by Defendant Janssen from the Company:

| Fiscal Year | Total Compensation ($) | Salary ($) | Option Awards ($) | All Other Compensation ($) |
|---|---|---|---|---|
| 2016 | 1,072,240 | 400,000 | 670,240 | 2,000 |

36.     The Company's 2016 Proxy Statement stated the following about Defendant Janssen:

**Robert Janssen, M.D. – Chief Medical Officer and Vice President, Clinical Development**

Dr. Janssen was appointed Chief Medical Officer and Vice President, Clinical Development and Regulatory Affairs in July 2013. He most recently served as Dynavax's Vice President, Medical Affairs since November 2012 and was previously Senior Director, Clinical Development at Dynavax from 2010 through 2012, during which time he was extensively involved with Phase 3 clinical development of HEPLISAV-B and its U.S. and European licensing applications. Prior to joining Dynavax, Dr. Janssen was Vice President, Medical Affairs at Gilead from 2008 to 2010 where he was responsible for oversight of physician and health care provider education focused on HIV and hepatitis B therapies. Until 2008, Dr. Janssen spent 23 years at the U.S. Centers for Disease Control and Prevention ("CDC"), most recently as the Director of the Division of HIV/AIDS Prevention from 2000 to 2008. Under his leadership, CDC first explored HIV treatment as a mode of HIV prevention and launched several of the earliest Phase 3 trials of pre-exposure prophylaxis for HIV. Dr. Janssen received a Bachelor of Arts degree with Honors in Humanities from Stanford University and his M.D. degree from the University of Southern California. He is a neurologist with training in virology at the University of Pennsylvania. Dr. Janssen has been the beneficiary of numerous honors and awards during his career. He has published over 130 scientific articles in a variety of journals and has served as a reviewer for leading scientific journals.

**Defendant Plotkin**

37.     Defendant Stanley A. Plotkin ("Plotkin") has been a member of the Board since August 2005. Upon information and belief, he is a citizen of California. During the period of time when the price of the Company's stock was artificially inflated, Defendant Plotkin beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The 2016 Proxy Statement | January 29, 2016 | 11,250 |

38. Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Plotkin beneficially owned approximately $271,013 worth of Company common stock.

39. The following table summarizes the compensation received by Defendant Plotkin from the Company:

| Fiscal Year | Total Compensation ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|
| 2016 | 110,692 | 40,000 | 70,692 |

40. The Company's 2016 Proxy Statement stated the following about Defendant Plotkin:

**Stanley A. Plotkin, M.D.**

Dr. Plotkin has been a member of our Board since August 2005. Dr. Plotkin is Emeritus Professor of the University of Pennsylvania. Until 1991, he was Professor of Pediatrics and Microbiology at the University of Pennsylvania and Professor of Virology at the Wistar Institute and, at the same time, Director of Infectious Diseases and Senior Physician at the Children's Hospital of Philadelphia. In 1991, Dr. Plotkin left the University to join the vaccine manufacturer Pasteur-Mérieux-Connaught (today, Sanofi Pasteur), where for seven years he was Medical and Scientific Director, based at Marnes-la-Coquette, outside Paris. Until 2009, he was an Executive Advisor to Sanofi Pasteur. The Board believes that Dr. Plotkin's significant experience in development and manufacturing of vaccines provides significant insights for the strategy of the Company with respect to key technical and operational issues in vaccine development. Dr. Plotkin's career included an internship at Cleveland Metropolitan General Hospital, residency in pediatrics at the Children's Hospital of Philadelphia and the Hospital for Sick Children in London and three years in the Epidemic Intelligence Service of the Centers for Disease Control of the U.S. Public Health Service. He has been chairman of the Infectious Diseases Committee and the AIDS Task Force of the American Academy of Pediatrics, liaison member of the Advisory Committee on Immunization Practices and Chairman of the Microbiology and Infectious Diseases Research Committee of the National Institutes of Health.

**Defendant Oronsky**

41.     Defendant Arnold Oronsky ("Oronsky") has been a member of the Board since November 1996 and became Chairman of the Board in February 2006. Defendant Oronsky is a member of the Audit Committee. Upon information and belief, he is a citizen of California. During the period of time when the price of the Company's stock was artificially inflated, Defendant Oronsky beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The 2016 Proxy Statement | January 29, 2016 | 48,756 |

42.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Oronsky beneficially owned approximately $1,174,532 worth of Company common stock.

43.     The following table summarizes the compensation received by Defendant Oronsky from the Company:

| Fiscal Year | Total Compensation ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|
| 2016 | 143,192 | 72,500 | 70,692 |

44.     The 2016 Proxy Statement stated the following about Defendant Oronsky:

**Arnold L. Oronsky, Ph.D.**

Dr. Oronsky has been a member of our Board since November 1996 and became Chairman in February 2006. Dr. Oronsky has been a managing director with InterWest Partners, a venture capital firm, since 2009. Prior to joining InterWest Partners in 1994, Dr. Oronsky was Vice President of Discovery Research for the Lederle Laboratories division of American Cyanamid, a pharmaceutical company. From 1973 until 1976, Dr. Oronsky was head of the inflammation, allergy and immunology research program at Ciba-Geigy Pharmaceutical Company. Dr. Oronsky also serves as a senior lecturer in the Department of Medicine at The Johns Hopkins Medical School. Dr. Oronsky has won numerous grants and awards and has published over 125 scientific articles. Dr. Oronsky currently serves on the boards of directors of Tesaro, Inc., an oncology-focused biopharmaceutical company, and Applied Genetic Technologies Corporation, a biotechnology company. Dr. Oronsky also served on the board of directors of MacroGenics, Inc., a biopharmaceutical company,

from 2000 to 2014. The Board believes that Dr. Oronsky's significant experience in growing and developing life sciences companies, particularly in the immunology area, provides significant leadership and insights for the Board in defining the strategy of the Company. He received his Ph.D. from Columbia University, College of Physicians and Surgeons and his A.B. from New York University.

**Defendant Brege**

45.     Defendant Laura Brege ("Brege") has been a member of the Board since February 2015. Defendant Brege is the Chairperson of the Audit Committee. Upon information and belief, she is a citizen of California. During the period of time when the price of the Company's stock was artificially inflated, Defendant Brege beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The 2016 Proxy Statement | January 29, 2016 | 500 |

46.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Brege beneficially owned approximately $12,045 worth of Company common stock.

47.     The following table summarizes the compensation received by Defendant Brege from the Company:

| Fiscal Year | Total Compensation ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|
| 2016 | 130,692 | 60,000 | 70,692 |

48.     The Company's 2016 Proxy Statement stated the following about Defendant Brege:

**Laura Brege**

Ms. Brege has been a member of our Board since February 2015. Since September 2015, she has served as managing director of Cervantes Life Science Partners, LLC, a consulting firm providing integrated business solutions to life sciences companies. She has over 20 years of executive management experience in the pharmaceutical, biotechnology and venture capital industries. From September 2012 to July 2015, Ms. Brege was President and Chief Executive Officer of Nodality Inc., a life sciences company focused on innovative personalized medicine. Prior to joining Nodality in 2012, Ms. Brege held several senior-level positions at Onyx Pharmaceuticals, Inc., a biopharmaceutical and

biotherapeutics company, from 2006 until 2012, including positions as Executive Vice President and Chief Operating Officer. While at Onyx she led multiple functions, including commercialization, strategic planning, corporate development, and medical, scientific and government affairs. Prior to Onyx, Ms. Brege was a General Partner at Red Rock Capital Management, a venture capital firm specializing in early stage financing for technology companies. Previously Ms. Brege was Senior Vice President and Chief Financial Officer at COR Therapeutics, where she helped build the company from an early stage R&D company through commercial launch of a successful cardiovascular product. Earlier in her career, she served as Chief Financial Officer at Flextronics, Inc. and Treasurer of The Cooper Companies. She serves on the board of directors of the following public pharmaceutical companies: Acadia Pharmaceuticals, Inc., Aratana Therapeutics, Inc., Pacira Pharmaceuticals, Inc. and Portola Pharmaceuticals. During the past five years, Ms. Brege also served on the boards of directors of Angiotech Pharmaceuticals, Inc., a biotechnology company, and Delcath Systems, Inc., a pharmaceutical company. Our Board believes that Ms. Brege's background in finance and management of biotechnology companies provides important strategic insights for the Board in setting strategy and reviewing the operations of the Company, as well as qualifies Ms. Brege to be nominated as a director. Ms. Brege earned her undergraduate degrees from Ohio University (Honors Tutorial College) and her MBA degree from the University of Chicago.

**Defendant Cano**

49.     Defendant Francis R. Cano ("Cano") was appointed to the Board in November 2009. Defendant Cano is a member of the Compensation Committee and the Nominating and Governance Committee. Upon information and belief, he is a citizen of California. During the period of time when the price of the Company's stock was artificially inflated, Defendant Cano beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The 2016 Proxy Statement | January 29, 2016 | 14,950 |

50.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Cano beneficially owned approximately $360,146 worth of Company common stock.

51.     The following table summarizes the compensation received by Defendant Cano from the Company:

| Fiscal | Total | Approximate | Approximate |
|---|---|---|---|

| Year | Compensation ($) | Compensation Paid in Cash ($) | Compensation Paid in Stock ($) |
|------|------------------|-------------------------------|--------------------------------|
| 2016 | 122,692 | 52,000 | 70,692 |

52.     The 2016 Proxy Statement stated the following about Defendant Cano:

**Francis R. Cano, Ph.D.**

Dr. Cano was appointed to our Board in November 2009. Dr. Cano has been President and Founder of Cano Biotech Corp., a consulting firm focusing on the vaccine business, since 1996 and also serves on the board of Biomerica, Inc., a developer and manufacturer of diagnostic products. Previously, Dr. Cano served on the board of Arbor Vita Corporation, a biopharmaceutical company. From 1993 to 1996, Dr. Cano was President and Chief Operating Officer for Aviron, a biopharmaceutical company, which was later acquired by MedImmune in 2001. As a Co-Founder of Aviron, he completed two rounds of venture financing, a licensing agreement with SmithKline Biologicals and in-licensed Flu-Mist influenza vaccine from the National Institutes of Health. For 21 years, Dr. Cano worked with the Lederle Laboratories Division of American Cyanamid, most recently as Vice President and General Manager of the Biologicals unit. The Board believes that Dr. Cano's experience as a founder of and advisor to established vaccine businesses provides significant insights for the strategy of the Company with respect to key technical and operational issues in vaccine development. He earned a Ph.D. in Microbiology from Pennsylvania State University, served as a Research Associate at Rutgers Institute of Microbiology, and holds a M.S. in Microbiology and a B.S. in Biology from St. John's University.

**<u>Defendant Carson</u>**

53.     Defendant Dennis A. Carson ("Carson") has been a member of the Board since December 1997. Upon information and belief, he is a citizen of California. During the period of time when the price of the Company's stock was artificially inflated, Defendant Carson beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|-----------------------|------------|--------------------------------|
| The 2016 Proxy Statement | January 29, 2016 | 18,062 |

54.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Carson beneficially owned approximately $435,114 worth of Company common stock.

55.     The following table summarizes the compensation received by Defendant Carson from the Company:

| Fiscal Year | Total Compensation ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|
| 2016 | 110,692 | 40,000 | 70,692 |

56.     The Company's 2016 Proxy Statement stated the following about Defendant Carson:

**Dennis A. Carson, M.D.**

Dr. Carson has been a member of our Board since December 1997. Dr. Carson is a noted researcher in the fields of autoimmune and immunodeficiency diseases and is co-discoverer with Dr. Eyal Raz of the immunostimulatory sequences (ISS) that form the basis of our technology. He has played key roles in the founding of Vical, Inc., a gene therapy company, IDEC Pharmaceuticals, a biopharmaceutical company, and Triangle Pharmaceuticals, a pharmaceutical company. Dr. Carson is former director of the Rebecca and John Moores Cancer Center at the University of California, San Diego and has been a professor in the Department of Medicine at the University of California, San Diego since 1990. The Board believes that Dr. Carson's significant experience in research and development provides important insights for the strategy of the Company, particularly with regard to scientific opportunities for development by the Company, and qualifies Dr. Carson to be nominated as a director. He is a member of the National Academy of Sciences, the American Academy of Arts and Sciences, and the Institute of Medicine, as well as the American Association for Cancer Research, the American Society for Clinical Investigation, the American Society of Hematology and the Association of American Physicians. He received his M.D. from Columbia University and his B.A. from Haverford College. Dr. Carson completed his residency in internal medicine and a postdoctoral fellowship at the University of California, San Diego.

**Defendant Kisner**

57.     Defendant Daniel L. Kisner ("Kisner") has been a member of the Board since July 2010. Defendant Kisner is the Chairperson of the Nominating and Governance Committee and a member of the Compensation Committee. Upon information and belief, he is a citizen of California. During the period of time when the price of the Company's stock was artificially inflated, Defendant Kisner beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The 2016 Proxy Statement | January 29, 2016 | 9,250 |

58. Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Kisner beneficially owned approximately $222,832 worth of Company common stock.

59. The following table summarizes the compensation received by Defendant Kisner from the Company:

| Fiscal Year | Total Compensation ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|
| 2016 | 127,692 | 57,000 | 70,692 |

60. The Company's 2016 Proxy Statement stated the following about Defendant Kisner:

**Daniel L. Kisner, M.D.**

Dr. Kisner has been a member of our Board since July 2010. From 2003 to 2010, Dr. Kisner served as a partner at Aberdare Ventures and prior to that as President and CEO of Caliper Technologies, leading its evolution from a start-up focused on microfluidic lab-on-chip technology to a publicly traded, commercial organization. Prior to Caliper, he was the President and Chief Operating Officer of Isis Pharmaceuticals, Inc., a biomedical pharmaceutical company. Previously, Dr. Kisner was Division Vice President of Pharmaceutical Development for Abbott Laboratories and Vice President of Clinical Research and Development at SmithKline Beecham Pharmaceuticals. In addition, he held a tenured position in the Division of Oncology at the University of Texas, San Antonio School of Medicine and is certified by the American Board of Internal Medicine in Internal Medicine and Medical Oncology. Additionally, he is currently serving on the boards of Conatus Pharmaceuticals, Inc., a biotechnology company, Lpath, Inc., a biotechnology company and Zynerba Pharmaceuticals, a biotechnology company. Dr. Kisner previously served as Chairman of the board for Tekmira Pharmaceuticals, a biopharmaceutical company, until March 2015. Our Board believes that Dr. Kisner's background with larger, complex technology-based organizations as well as his significant experience with corporate transactions, including investing in venture-backed life science companies provides the Board with insights for setting strategy of the Company. He holds a B.A. from Rutgers University and an M.D. from Georgetown University.

**<u>Defendant Phillips</u>**

61. Defendant Peggy V. Phillips ("Phillips") has been a member of the Board since August 2006. Defendant Phillips is the Chairperson of the Compensation Committee and a member of the Audit Committee. Upon information and belief, she is a citizen of California. During the period of time when

the price of the Company's stock was artificially inflated, Defendant Phillips beneficially owned the

following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
| --- | --- | --- |
| The 2016 Proxy Statement | January 29, 2016 | 25,802 |

62.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded

for $24.09, Defendant Phillips beneficially owned approximately $621,570 worth of Company common

stock.

63.     The following table summarizes the compensation received by Defendant Phillips from the

Company:

| Fiscal Year | Total Compensation ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
| --- | --- | --- | --- |
| 2016 | 133,192 | 62,500 | 70,692 |

64.     The Company's 2016 Proxy Statement stated the following about Defendant Phillips:

**Peggy V. Phillips**

Ms. Phillips has been a member of our Board since August 2006. Ms. Phillips served on
the board of directors of Tekmira Pharmaceuticals from February 2014 to March 2015. Ms.
Phillips served on the board of directors of Portola Pharmaceuticals, a biopharmaceutical
company, from 2006 to 2013. From 2003 until 2011, Ms. Phillips served on the board of
the Naval Academy Foundation. From 1996 until 2002, she served on the board of directors
of Immunex Corporation, a biotechnology company, and, from 1999, she served as the
Chief Operating Officer until the company was acquired by Amgen in 2002. During her
career at Immunex, she held positions of increasing responsibility in research,
development, manufacturing, sales and marketing. As Senior Vice President for
Pharmaceutical Development and General Manager for Enbrel® from 1994 until 1998, she
was responsible for clinical development and regulatory affairs as well as the launch, sales
and marketing of the product. Prior to joining Immunex, Ms. Phillips worked at Miles
Laboratories. The Board believes that Ms. Phillips provides significant experience in
development and commercialization of biotechnology products. Her background and
experience with larger, complex organizations provides significant operational and
strategic insights in assessing the strategy of the Company. Ms. Phillips holds a B.S. and a
M.S. in microbiology from the University of Idaho.

**Defendant Ricciardi**

65.     Defendant Natale Ricciardi ("Ricciardi") has been a member of the Board since June 2013. Defendant Ricciardi is a member of the Nominating and Governance Committee. Upon information and belief, he is a citizen of California. During the period of time when the price of the Company's stock was artificially inflated, Defendant Ricciardi beneficially owned the following number of shares of Company stock:

| Source of Information | As of Date | # of Shares Beneficially Owned |
|---|---|---|
| The 2016 Proxy Statement | January 29, 2016 | 2,750 |

66.     Given that, as of the close of trading on January 29, 2016 one share of common stock traded for $24.09, Defendant Ricciardi beneficially owned approximately $66,248 worth of Company common stock.

67.     The following table summarizes the compensation received by Defendant Ricciardi from the Company:

| Fiscal Year | Total Compensation ($) | Approximate Compensation Paid in Cash ($) | Approximate Compensation Paid in Stock ($) |
|---|---|---|---|
| 2016 | 115,692 | 45,000 | 70,692 |

68.     The Company's 2016 Proxy Statement stated the following about Defendant Ricciardi:

**Natale ("Nat") Ricciardi**

Mr. Ricciardi has been a member of our Board since June 2013. Mr. Ricciardi spent his entire 39-year career at Pfizer Inc., a biopharmaceutical company, retiring in 2011 as a member of the Pfizer Executive Leadership Team. While holding the positions of President, Pfizer Global Manufacturing, and Senior Vice President of Pfizer Inc. from 2004 until 2011, Mr. Ricciardi was directly responsible for all of Pfizer's internal and external supply organization, a global enterprise that grew to more than 100 manufacturing facilities supplying small and large molecule pharmaceuticals, vaccines, consumer, nutrition and animal health products. Mr. Ricciardi maintained responsibility for global manufacturing activities from 2004 through 2011. Previously, from 1999 to 2004, he had oversight for Pfizer's U.S. manufacturing operations and from 1995 to 1999 was Vice President of Manufacturing for Pfizer's Animal Health Group. Mr. Ricciardi served on the boards of the National Association of Manufacturers and Mediacom Communications Corporation until its privatization in 2011. He is currently a member of the board of the 21st Century Foundation of The City College of New York. He is also on the Advisory Board of

HealthCare Royalty Partners and the board of directors of Asterias Biotherapeutics, Inc., serving as Chair of the Compensation Committee and member of the Audit Committee, and Rapid Micro Biosystems, Inc. Our Board believes Mr. Ricciardi's 39-year career at Pfizer Inc., a leading pharmaceutical company, including as a member of the Pfizer Executive Leadership Team and direct responsibility for all of Pfizer's internal supply organization, including global manufacturing, provides the Board with insights for reviewing the operations of the Company. Mr. Ricciardi earned a degree in Chemical Engineering from The City College of New York and an MBA in Finance and International Business from Fordham University.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

69.     By reason of their positions as officers, directors, and/or fiduciaries of Dynavax and because of their ability to control the business and corporate affairs of Dynavax, the Individual Defendants owed Dynavax and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Dynavax in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Dynavax and its shareholders so as to benefit all shareholders equally.

70.     Each director and officer of the Company owes to Dynavax and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dynavax, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

72.     To discharge their duties, the officers and directors of Dynavax were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

73.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company,

as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dynavax, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Dynavax's Board at all relevant times.

74. To discharge their duties, the officers and directors of Dynavax were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Dynavax were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, the United States, and pursuant to Dynavax's own Code of Business Conduct and Ethics and Corporate Governance Guidelines;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Dynavax conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Dynavax and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Dynavax's operations would comply with all applicable laws and Dynavax's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.      Each of the Individual Defendants further owed to Dynavax and the shareholders the duty of loyalty requiring that each favor Dynavax's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Dynavax and were at all times acting within the course and scope of such agency.

77.      Because of their advisory, executive, managerial, and directorial positions with Dynavax, each of the Individual Defendants had access to adverse, non-public information about the Company.

78.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Dynavax.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Dynavax was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Dynavax, and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

84.     The Company's Code of Business Conduct and Ethics (the "Code of Ethics") governs the conduct of all of the Company's officers, directors, and employees.

85.     The Code of Ethics provides, as to "Clarifying Questions and Concerns; Reporting Possible Violations," that:

> If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Chief Ethics and Compliance Officer. Even the appearance of impropriety can be very damaging and should be avoided.
>
> If you are aware of a suspected or actual violation of Code standards by others, you have a responsibility to report it. You are expected to promptly provide a compliance resource with a specific description of the violation that you believe has occurred, including any information you have about the person (or persons) involved and the time of the violation. Whether you choose to speak with your supervisor, the Chief Ethics and Compliance Officer, the Vice President of Human Resources, or report the violation through MySafeWorkplace, you should do so without fear of any form of retaliation. We will take prompt disciplinary action against any Dynavax personnel who may retaliate against you, up to and including termination of employment.

86.     The Code of Ethics provides, as to "Product Promotion," that:

> The manner in which we promote our products is also highly regulated worldwide. At Dynavax, we are committed to honest, truthful, and lawful marketing and promotional practices.
>
> To this end, we require that, among other things:
>
> • All promotional discussions and activities are consistent with the product's approved label, including
> any country-specific labeling and prescribing information;
> • Written materials used in promoting Dynavax products are fair, balanced, complete, accurate, and not
> misleading; and
> • Discussions about Dynavax products provide fair balance by describing all safety information accurately and truthfully

87.     The Code of Ethics provides, as to "Conflicts of Interest," that:

We respect the right of all Dynavax personnel to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, Dynavax personnel should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of Dynavax. A conflict of interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect Dynavax personnel to be free from influences that conflict with the best interests of Dynavax. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided.

If you have any questions about a potential conflict or if you become aware of an actual or potential conflict, and you are not an officer or director of Dynavax, you should discuss the matter with your supervisor or the Chief Ethics and Compliance Officer. Supervisors may not resolve conflict of interest matters without first seeking the approval of the Chief Ethics and Compliance Officer. If the supervisor is involved in the potential or actual conflict, you should discuss the matter directly with the Chief Ethics and Compliance Officer. Officers and directors may seek authorization from the Board of Directors.

88.     The Code of Ethics provides, as to "Protection and Proper Use of Company Assets," that:

All Dynavax personnel are expected to protect our assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on our cash position. Our property, such as office supplies, computer equipment, buildings, reagents, and products, is expected to be used only for legitimate business purposes.

* * *

Any misuse or suspected misuse of our assets must be immediately reported to your supervisor or the Chief Ethics and Compliance Officer.

89.     The Code of Ethics provides, as to "Maintenance of Corporate Books, Records, Documents, and Accounts; Financial Integrity; Public Reporting," that:

The integrity of our records and public disclosure depends on the validity, accuracy, and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, and others with whom we do business. As a result, it is important that our books, records, and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs, and expenses, as well as all transactions and changes in assets and liabilities. We require that:

• No entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or misclassifies any transactions as to accounts or accounting periods;

• Transactions be supported by appropriate documentation;

• The terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions, and all such documentation be reflected accurately in our books and records;

• Dynavax personnel comply with our system of internal financial controls; no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

• Dynavax personnel promptly report to their supervisor significant deficiencies in the design or

operation of our system of internal financial controls which could adversely affect Dynavax's ability to maintain books, records, and accounts that accurately and fairly reflect Dynavax's assets, liabilities, revenues, costs, and expenses.

Our accounting records are also relied upon to produce reports for our management, stockholders, and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic reports that we file with the SEC. These reports must provide full, fair, accurate, timely, and understandable disclosure, and must fairly present our financial condition and results of operations. Dynavax personnel who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these reports, should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about Dynavax that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

• No Dynavax personnel may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC, or other applicable laws, rules, and regulations;

• All Dynavax personnel must cooperate fully with our Finance Department, as well as our independent public accountants and outside counsel, respond to their questions with candor, and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and,

• No Dynavax personnel should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC, or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any Dynavax personnel who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Chief Ethics and Compliance Officer, or the Vice President of Human Resources, or to use the reporting resources described in Section 2A.

90. The Code of Ethics provides, as to "Government Investigations," that:

You must promptly notify the General Counsel of any government investigation or inquiries from government agencies concerning Dynavax. You should not destroy any record, books of account, or other documents relating to Dynavax except in accordance with the Company's document retention policy.

You must not obstruct the collection of information, data, or records. The Company provides information to the government that it is entitled to during an inspection, investigation, or request for information. You must not lie to government investigators or make misleading statements. You must not attempt to cause any Dynavax personnel to fail to provide accurate information to government investigators.

91. The Code of Ethics provides, as to "Legal Compliance," that:

Obeying the law, both in letter and in spirit, is the foundation of this Code. Dynavax's success depends upon each individual operating within legal guidelines and cooperating with local, national, and international authorities. It is therefore essential that you understand the legal and regulatory requirements applicable to your business unit and area of responsibility. Some of the more important and generally applicable laws are described in the Dynavax Policies and Guidelines, which can be found on the Company's intranet site: http://intranet.dynavax.com. There you can find policies and procedures pertaining to a variety of relevant topics, including: healthcare compliance and interactions with healthcare professionals; employment laws concerning equal employment; sexual and other types of harassment; environmental, health and safety laws; and insider trading.

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules, and regulations may subject an individual, as well as Dynavax, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interest to know and comply with our legal and ethical obligations, and to engage in thoughtful communication practices.

92. In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting and of the Individual Defendants' schemes and caused or facilitated the schemes to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust

enrichment. In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to: 1) comply with the Code of Ethics and applicable laws and regulations; 2) avoid conflicts of interest; 3) act in the Company's best interests; 4) protect corporate assets; 5) appropriately maintain the Company's books, records, accounts, and financial statements; 6) disseminate accurate and complete information to shareholders and the public; 7) report violations of the Code of Ethics; and 8) make accurate filings with the SEC.

## DYNAVAX'S CORPORATE GOVERNANCE GUIDLINES

93.     Pursuant to the Company's Corporate Governance Guidelines (the "Corporate Guidelines"), the entire Board is subject to the corporate governance practices contained therein.

94.     The Corporate Guidelines provides, as to "Purpose and Nature," that: "These Guidelines reflect the Board's commitment to monitor the effectiveness of policy and decision making at both the Board and the management level, with the objective of enhancing stockholder value over the long term."

95.     The Corporate Guidelines provides, as to "Role of the Board," that:

The Board is selected by the stockholders to provide oversight of, and strategic guidance to, senior management. The core responsibility of a Board member is to fulfill his or her fiduciary duties of care and loyalty and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Service on the Board requires significant time and attention on the part of directors. More specifically, the Board has responsibilities to review, approve and monitor fundamental financial and business strategies and major corporate actions, assess major risks facing the Company and consider ways to address those risks, select and oversee management and determine its composition and oversee the establishment and maintenance of processes and conditions to maintain the integrity of the Company. Directors are expected to rigorously prepare for, attend, and participate in all Board and applicable Board committee meetings. Directors are also invited to attend, either in person or telephonically, the annual meeting of stockholders. Directors are expected to maintain an attitude of constructive involvement and oversight; they are expected to ask relevant, incisive and probing questions and require honest and accurate answers. Directors must act with integrity and are expected to demonstrate a commitment to the Company, its values and its business and to long-term stockholder value.

96.     The Corporate Guidelines provides, as to "Meetings," that:

The Board holds regularly scheduled meetings throughout the year and holds additional meetings as necessary to carry out its responsibilities. Directors are expected to attend Board meetings and meetings of the Board committees on which they serve.

97.     The Corporate Guidelines provides, as to "Access to Management," that:

The Board and Board committees will have complete access to the Company's management and employees. Any meetings or contacts that a director wishes to initiate may be arranged directly by the director or through the CEO. Directors will use their judgment to ensure that any contact with Company personnel is not disruptive to the Company's operations, and will apprise the CEO of any material contact. The Board encourages the Company's management to invite members of the Company's management to Board meetings in order to (a) provide additional insight into matters discussed during the meeting or (b) expose to the Board key managers with future potential in the Company.

98.     The Corporate Guidelines provides, as to "Retention of Advisors and Consultants," that:

The Board, and each committee of the Board, shall have the authority to retain, at the expense of the Company, outside financial, legal or other advisors as they deem necessary or appropriate, in each case without consulting or obtaining the approval of any officer of the Company in advance. In addition, the Board's standing committees have the specific authority in their respective charters with respect to the retention of, and seeking advice from, any advisors, all at the expense of the Company.

99.     The Corporate Guidelines provides, as to "Strategic Planning," that:

The Board reviews and, where appropriate, approves the Company's major financial objectives, strategic and operating plans and actions.

100.    In violation of the Corporate Guidelines, the Individual Defendants who are members of the Board conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' schemes, including the scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.  In violation of the Corporate Guidelines, the Individual Defendants who are members of the Board consciously disregarded their duties of loyalty, ethics, to act in the best interests of the Company, to use their free access to management to obtain all information necessary to fulfill their duties, and to assess their own performance as well as the CEO's.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

101.    Dynavax is a clinical-stage biopharmaceutical company that uses toll-like receptor biology to discover and develop novel vaccines and therapeutics. The Company's development programs focus on vaccines and cancer immunotherapy.

### HEPLISAV / HEPLISAV-B

102.    At the beginning of the Relevant Period, the Company's lead product was HEPLISAV, an investigational adult hepatitis B vaccine that was designed to provide higher and earlier protection and with fewer doses, than other vaccines currently licensed at that time.

103.    Beginning in February 2014, upon information and belief, the Company began to refer to HEPLISAV as "HEPLISAV-B," with the Company noting in subsequent SEC filings that HEPLISAV-B is "also known as 'HEPLISAV.'"

104.    HEPLISAV-B was described by the Company as a two-dose investigational adult hepatitis B vaccine in Phase 3 clinical development. Hepatitis B is a viral disease of the liver that can become a chronic disease and can lead to cirrhosis of the liver, hepatocellular carcinoma and death. There is no cure for hepatitis B, and disease prevention through effective vaccines is critical to reducing the spread of the disease. According to Dynavax, HEPLISAV- B was designed to provide higher and earlier protection with fewer doses than currently approved vaccines.

105.    Dynavax has worldwide commercial rights to HEPLISAV-B, but it intended to focus its initial commercialization efforts on the U.S. market. U.S. has a large market for adult hepatitis B vaccines, and this market continued to grow over the past few years as the Advisory Committee on Immunization Practices ("ACIP") expanded its recommendation for adults who should be vaccinated against hepatitis B to include people with diabetes mellitus (type 1 and type 2) since late 2011. The U.S. Centers for Disease Control and Prevention ("CDC") estimated that about 20 million adults were diagnosed with diabetes, and

1.5 million new cases were diagnosed each year. This population greatly increased the number of adults recommended for vaccination against hepatitis B in the U.S.

**Biologics License Application and the Approval Process**

106.    Vaccine products in the U.S. are regulated by the Center for Biologics Evaluation and Research ("CBER") of the FDA, pursuant to the Public Health Service Act and the Federal Food, Drug and Cosmetic Act.

107.    Vaccine clinical development follows the same general pathway as for drugs and other biologics. Before starting clinical trials with a vaccine on humans, a sponsor must submit an Investigational New Drug application to FDA, describing the vaccine, its method of manufacture, and quality control tests for release. The application should also include information about the vaccine's safety and ability to elicit a protective immune response (immunogenicity) in animal testing, as well as the proposed clinical protocol for studies in humans.

108.    Pre-marketing vaccine clinical trials are typically done in three phases.  Initial human studies, referred to as Phase 1, are safety and immunogenicity studies performed in a small number of closely monitored subjects. Phase 2 studies are dose-ranging studies and may enroll hundreds of subjects. Finally, Phase 3 trials typically enroll thousands of individuals and provide the critical documentation of effectiveness and important additional safety data required for licensing. At any stage of the clinical or animal studies, if data raise significant concerns about either safety or effectiveness, FDA may request additional information or studies, or may halt ongoing clinical studies.[2]

109.    After the successful completion of pre-marketing clinical trials, the sponsor can then submit a BLA. To be considered, the BLA must provide the multidisciplinary FDA reviewer team

---

[2] http://www.fda.gov/BiologicsBloodVaccines/DevelopmentApprovalProcess/BiologicsLicenseApplicationsBLAProcess/ucm133096.htm.

(medical officers, microbiologists, chemists, biostatisticians, etc.) with the efficacy and safety information necessary to make a risk/benefit assessment and to recommend or oppose the approval of a vaccine.

110.    Following the FDA's review of the BLA, the sponsor and the FDA may present their findings to FDA's VRBPAC. This non-FDA expert committee (scientists, physicians, biostatisticians, and a consumer representative) provides advice to the Agency regarding the safety and efficacy of the vaccine for the proposed purpose.

111.    If a sponsor's BLA were not approved, FDA would then issue a CRL communicating its decision to not approve the application. The CRL is only issued for applications that are not approved.

**Dynavax's BLA and the 2013 CRL**

112.    On April 26, 2012, Dynavax announced it had submitted a BLA to the FDA for HEPLISAV, seeking approval for the vaccine against infection caused by all known subtypes of hepatitis B virus in adults, ages 18-70. This is an important step the Company took to transition from a clinical-stage biopharmaceutical company, with no marketable products, to a commercial operation.

113.    However, Dynavax's first attempt was not successful. On November 15, 2012, Dynavax had a meeting with the FDA's VRBPAC concerning HEPLISAV. Although the committee believed that the trial data submitted by the Company established the efficacy of HEPLISAV, it was concerned that such data was not sufficient to adequately support the safety of HEPLISAV. Among other things, the committee questioned the size of the safety database, which included only 4,425 subjects. Such size of the safety database was inadequate to rule out potential rare adverse autoimmune events, given that HEPLISAV-B contains a novel adjuvant[3] that had not been broadly studied before.

114.    Thereafter, on February 25, 2013, the FDA sent the 2013 CRL to Dynavax rejecting the BLA and asked for additional data to support the assessment of possible adverse events. The FDA also required Dynavax to conduct additional safety trials before it would even consider approving HEPLISAV.

---

[3] An adjuvant is a pharmacological agent added to a drug to increase or aid its effect.

115.    Accordingly, the Company designed an additional clinical study of HEPLISAV to evaluate the overall safety of the product with respect to clinically significant adverse events and to address the FDA's concern regarding the size of the HEPLISAV safety database.

**Dynavax's HBV-23 Phase 3 Clinical Trial and Its Revised BLA**

116.    On April 15, 2014, Dynavax announced initiation of a new Phase 3 clinical trial of HEPLISAV-B known as HBV-23. According to the Company, HBV-23 was an observer-blinded, randomized, active-controlled trial at approximately 40 sites in the U.S. Approximately 8,250 adult subjects between the ages of 18 and 70 were randomized in a 2:1 ratio to receive a 2-dose series of HEPLISAV-B or a 3-dose series of a control vaccine, Engerix-B®. One of the co-primary objectives of HBV-23 was to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events.

117.    Approximately two years later, Dynavax reported the results of the HBV-23 clinical trial and disclosed its plan to submit the results in the form of a revised BLA to address "all issues raised by the FDA" in the 2013 CRL.

118.    On March 30, 2016, the FDA accepted for review the Company's Revised BLA for HEPLISAV-B and established September 15, 2016 as the Prescription Drug User Fee Act ("PDUFA") action date for completion of its review.

**The Relevance of Cardiac Adverse Events**

119.    As noted by the Company, HBV-23 was designed with "the primary safety objective [] to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events."

120.    The Individual Defendants were aware that cardiac adverse events, such as the ones observed in HBV-23, were a known area of concern for the FDA.  In fact, a January 2004 article published in the *Journal of the American Medical Association* titled "Scientific and regulatory Reasons for Delay

and Denial of FDA Approval of Initial Applications for New Drugs," and authored by six FDA officials, stated:

> We found that some drugs inevitably failed because they proved to be ineffective or unsafe and others failed because the data were inadequate to evaluate safety or efficacy.  . . . The most frequent safety concerns preventing approval were clinical adverse events that occurred in phase 3 trials, particularly those affecting the cardiovascular system. The high frequency of cardiac adverse events may be due partly to the range of conditions that were included in this category (thrombotic events, arrhythmic events, and other toxicities to the heart). However, cardiovascular toxicity may escape detection until late in drug development because of poor predictive models. Also, in recent years, the high-profile withdrawals by companies of cyclooxygenase 2 (COX-2) inhibitors have sensitized the drug development community to similar cardiac issues in new drug applications and there is increasing reluctance to accept certain levels of risk in the absence of a clear, unmet public health need. Even very large development programs may lack the power to identify serious rare adverse events.

121.    Thus, a reasonable investor would expect that the Company would disclose any numerical imbalance in cardiac adverse events observed during HBV-23.

122.    Moreover, during the Company's January 7, 2016 earnings call, the Individual Defendants led the investing public to believe that Dynavax would disclose an adverse event even if there was not a causal connection between the adverse event and HEPLISAV-B, when Defendant Gray stated:

> Rob has commented in detail on the single radiological finding in the study of a rare autoimmune event. Now many of you on the line will be wondering why we have mentioned this at all, which I think is a very fair question. We thought hard about whether it truly had relevance but concluded simply that you would favor transparency. We and the FDA have always recognized the potential for a random event to occur in a trial of this size and duration, and the FDA has consistently maintained that its primary interest is understanding the detail of any specific case.

123.    FE,[4] a former employee of the Company, notes that the Company was concerned with numerical imbalances in cardiac adverse events.  Per FE, Defendant Janssen was responsible for evaluating HBV-23's clinical trial data and the overall strategy for communicating Dynavax's FDA prospects.  FE moreover noted that the cardiac events data posed a considerable challenge for the Company in its efforts to determine whether such data were "real."  In addition to performing much of the

---

[4] Allegations about "FE" and his statements are drawn from paragraph 56 of the Consolidated Second Amended Class Action Complaint filed in the Securities Class Action on October 3, 2017, which refers to the same former employee, who is also referred to therein as "FE."

detailed analysis of this issue through Dynavax's Clinical Development and Drug Safety Department, the Company also retained an outside consultant with highly specialized credentials to review the clinical trial data and to add perspective.

**The FDA Postponed the PDUFA Action Date and Cancelled the VRBPAC Meeting**

124.     The approval process for the Revised BLA did not go as the Company had led the investing public to expect because the FDA was not satisfied with the data that Dynavax had submitted. Shortly after the Revised BLA was accepted, the FDA requested Dynavax to submit additional data to support its review.

125.     On April 8, 2016 Dynavax submitted additional data sets in response to the FDA request. Determining that the additional large data Dynavax provided represented "a major amendment" to the Revised BLA, the FDA pushed the PDUFA action date to December 15, 2016 in order to be able to review the Revised BLA.

126.      Thereafter, in August, the FDA notified Dynavax that a VRBPAC meeting had been scheduled for November 16, 2016 to review the Revised BLA for HEPLISAV-B.

127.     But less than a month later, on September 2, 2016, the FDA cancelled the VRBPAC meeting and informed Dynavax that it planned to make more information requests in the following weeks.

**The 2016 CRL**

128.     After an extended waiting period, on November 14, 2016, the Company announced, to the disappointment of the investing public, that the FDA again issued a CRL to Dynavax, citing concerns about specific adverse events of special interest and an imbalance in the number of cardiac events seen in the HBV-23 trial of HEPLISAV-B. The FDA also mentioned other concerns relating to analyses of the integrated safety data across different time periods and post-marketing commitments in its 2016 CRL. The FDA sought information and clarification from Dynavax regarding those cited concerns.

129.    The FDA's decision not to approve the Revised BLA could not have been a surprise to the Individual Defendants given the following facts: 1) that HBV-23 was not properly designed to address the FDA's concerns and issues set forth in the 2013 CRL; 2) there were significant adverse events associated with HEPLISAV-B and with data from HBV-23 showing a numerical imbalance in cardiac adverse events; 3) Dynavax failed to provide sufficient information to the FDA concerning specific adverse events of special interest, the numerical imbalance in a small number of cardiac events in HBV-23, new analyses of the integrated safety database across different time periods, and post-marketing commitments.

130.    As described in further detail below, despite knowing all the crucial facts set forth above, the Individual Defendants caused the Company to issue material false and misleading statements touting HEPLISAV-B's prospects of gaining FDA approval and its commercial readiness.

131.    On January 4, 2017, the Company suspended manufacturing of HEPLISAV-B and reduced its global workforce by 38%, causing the Company to incur restructuring costs related to one-time employee termination benefits, currently estimated to be $3.0 million.

132.    Back on December 20, 2016, the Company agreed to terminate a $100 million loan agreement because of its failure to obtain FDA approval of HEPLISAV-B.  The Company thereby was required to pay a $1.5 million termination fee.

**False and Misleading Statements of Material Fact Made to the Investing Public**

133.    On January 7, 2016, the Company issued a press release titled "Dynavax Reports Top Line of Phase 3 HEPLISAV-B™ Study" (the "1/7/16 Press Release").  In the 1/7/16 Press Release, the Company reported the following safety evaluation results:

**Safety results from HBV-23**

The co-primary endpoint of HBV-23 was to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events. Participants were randomized to HEPLISAV-B or Engerix-B in a two to one ratio. HEPLISAV-B participants were followed for 52 weeks after the last dose and Engerix-B participants were followed for 28 weeks after last dose. All adverse events considered to represent potential autoimmune disorders (Adverse Events of Special Interest, or AESIs) were reviewed by an independent

panel of experts from the Mayo Clinic.

Preliminary safety evaluation results include:

- 22 HEPLISAV-B participants experienced an AESI and 11 Engerix-B participants experienced an AESI. All were classified as not related to vaccination.
- Of the 33 AESIs in the study, 21 were adjudicated to be autoimmune events by the independent panel, with 11 reported in participants who received HEPLISAV-B and 10 in participants who received Engerix-B.
- In a secondary safety endpoint, there were no cases of Wegener's Granulomatosis (granulomatosis with polyangiitis) or Tolosa Hunt syndrome.
- One event in the HEPLISAV-B arm of the study was coded by a site investigator based solely on a radiological diagnosis as a rare autoimmune disease, Takayasu's arteritis. The independent panel of experts concluded the diagnostic criteria for the initial radiological diagnosis were not met and adjudicated the event as not related to vaccination.

The total safety database for HEPLISAV-B now comprises 10,038 participants.

\* \* \*

Dynavax plans to resubmit the HEPLISAV-B Biologics License Application (BLA) at the end of the first quarter of 2016 and anticipates a six-month review by the FDA. In the revised BLA, Dynavax plans to address all issues raised by the FDA in a February 2013 Complete Response Letter by submitting the results of HBV-23, integrated with previous clinical data, and responses to CMC issues in the Complete Response Letter.

134.    Defendant Gray confirmed the Company's intention to resubmit the HEPLISAV-B BLA by the end of March 2016 in the 1/7/16 Press Release. Additionally, the 1/7/16 Press Release quoted Defendant Janssen as stating, "These topline results are consistent with our expectations. With regard to the principal safety focus, Adverse Events of Special Interest, the results reflect a distribution consistent with randomization. To see such statistically significant differences in immunogenicity so consistently and across all groups and patient subsets, confirms the potential of HEPLISAV-B for people in need of protection."

135.    Also in the 1/7/16 Press Release, Defendant Gray stated:

We are delighted to report these topline results from HBV-23 and confirm our intention to resubmit the HEPLISAV-B BLA by the end of March. These results support our belief that HEPLISAV-B, if approved, could offer benefits to adults at risk for hepatitis B,

particularly given that these significant differences in seroprotection were demonstrated in a controlled setting, where compliance is optimized.

136.    On January 7, 2016, the Company also held an earnings call discussing HBV-23 results. During the call, Defendant Gray commented on the safety database for HEPLISAV-B, stating, in relevant part:

> Although 2 previously completed Phase III studies demonstrated the immunogenicity of HEPLISAV-B and that its overall safety appeared to be similar to the approved vaccine, in reviewing our BLA, the FDA concluded that a larger safety database was warranted. Based on our subsequent consultations with the agency, we designed HBV-23 to include more than 5,500 additional participants in the HEPLISAV-B safety database to provide a sufficiently sized safety database for FDA to make a determination regarding this product.

137.    Also during the call, Defendant Janssen commented on adverse events, stating, "[t]he overall safety profile of HEPLISAV-B was similar to that of Engerix-B.  Adverse events were generally balanced between the vaccine groups.  AESIs were also balanced.  Additionally, as with every study, especially of this size, we've noted some numerical imbalances, none of which are statistically significant."

138.    On March 8, 2016, the Company issued a press release titled, "Dynavax Reports Fourth Quarter and Year End 2015 Financial Results" (the "3/8/16 Press Release.")  In the 3/8/16 Press Release, Defendant Gray commented on HBV-23 and plans to resubmit the HEPLISAV-B BLA:

> During 2015, we completed HBV-23 and significantly strengthened the Company's cash position. Earlier this year we reported that this third pivotal study had met both co-primary endpoints. We plan to resubmit the HEPLISAV-B BLA (Biologics License Application) to the FDA by the end of this month. Based on our expectation of a six-month review, if our application is approved we expect to launch this product in the fourth quarter of this year . . . .

139.    On March 8, 2016, the Company also filed an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2015 ("2015 10-K"). The 2015 10-K was signed by Defendants Gray, Ostrach, Oronsky, Brege, Cano, Carson, Kisner, Phillips, Plotkin, and Ricciardi.

140.    The 2015 10-K stated, in pertinent part:

Our lead vaccine product candidate is HEPLISAV-B™, an investigational adult hepatitis

B vaccine. HEPLISAV-B combines 1018, a proprietary TLR9 agonist adjuvant, and recombinant hepatitis B surface antigen ("rHBsAg" or "HBsAg") that is manufactured by Dynavax GmbH, our wholly-owned subsidiary in Düsseldorf, Germany. In Phase 3 trials, HEPLISAV-B demonstrated earlier protection with fewer doses than currently approved vaccines and an adverse event profile similar to an approved hepatitis B vaccine. Based on those data, we submitted a Biologics License Application ("BLA") to the U.S. Food and Drug Administration ("FDA") in 2012. In 2013 the FDA issued a Complete Response Letter ("CRL") indicating that it would not approve the BLA primarily because hypothetical risks of the novel adjuvant warranted a larger safety database to assess the possibility of rare autoimmune side effects.

In October 2015 we completed HBV-23, a clinical trial that added more than 5,000 additional subjects to the HEPLISAV-B safety database in order to address the FDA's need for a larger safety database. HBV-23 was a Phase 3, observer-blinded, randomized, active-controlled, multicenter trial of the safety and immunogenicity of HEPLISAV-B compared with GlaxoSmithKline's ("GSK") Engerix-B in adults 18 to 70 years of age. HEPLISAV-B subjects received two doses at 0 and 1 month and Engerix-B subjects received three doses at 0, 1 and 6 months.

The primary objectives of HBV-23 were: (1) to evaluate the overall safety of HEPLISAV-B with respect to clinically significant adverse events; and (2) to demonstrate the noninferiority of the peak seroprotection rate induced by HEPLISAV-B compared to Engerix-B in subjects with type 2 diabetes mellitus. HEPLISAV-B subjects were evaluated for safety for one year following the second dose.

Based on preliminary top-line results from HBV-23 released in January 2016, both co-primary endpoints were met. The rates of clinically significant adverse events were consistent with randomization and HEPLISAV-B provided a statistically significant higher rate of seroprotection than Engerix-B in diabetic participants and in all participants as a group.

The total safety database for HEPLISAV-B currently includes 10,038 participants.

At the end of the first quarter of 2016, we intend to submit to FDA our revised BLA and respond to all questions raised in the CRL. We currently expect the submission will be assigned a 6-month Prescription Drug User Fee Act ("PDUFA") review period. If this timing is correct and HEPLISAV-B is approved upon completion of the review period, we expect to launch the product in the fourth quarter of 2016.

* * *

***We currently estimate that we have sufficient resources to meet our anticipated cash needs through at least the next 12 months based on cash, cash equivalents and marketable securities on hand as well as anticipated revenues and expenditures.***

(Emphasis added.)

141.     Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Exchange Act, Section 302 of the Sarbanes-Oxley Act of 2002 ("Sox"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sox, ("Sox Certifications"), signed by Defendants Gray and Ostrach, attesting to the accuracy of the 2015 10-K.

142.     The "SOX Certifications" contained the following attestations:

1.     I have reviewed this annual report on Form 10-K of Dynavax Technologies Corporation (the "registrant");

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report)

that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

143.   The statements in each of the foregoing SOX Certifications were false and/or misleading because the Company's internal controls over financial reporting were defective and insufficient to prevent the false and misleading statements and omissions of material fact alleged herein.

144.   The statements referenced above in ¶¶ 133-142 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to the Individual Defendants or recklessly disregarded by them: 1) HBV-23 was not properly designed to fully address the FDA's concerns and issues set forth in the 2013 CRL; 2) there were significant adverse events associated with HEPLISAV-B and with data from HBV-23 showing a numerical imbalance in cardiac adverse events; and 3) HEPISLAV-B's safety profile was not similar or comparable to that of Engerix-B.

145.   On March 30, 2016, the Company issued a press release titled, "Dynavax Announces FDA Acceptance for Review of Biologics License Application and PDUFA Action Date for HEPLISAV-B™" (the "3/30/16 Press Release"). The Company announced in the 3/30/16 Press Release that the FDA has established September 15, 2016 as the PDUFA action date for completion of its review.

146.   The 3/30/16 Press Release stated, in relevant part:

The HEPLISAV-B BLA is based on positive immunogenicity results from clinical trials that have generated safety data in more than 10,000 participants. Results of these trials showed that two doses of HEPLISAV-B given one month apart provides significantly higher rates of protection with an equivalent safety profile compared to three doses of Engerix-B, a currently marketed hepatitis B vaccine that is administered over six months. In Phase 3 studies across all participants, HEPLISAV-B achieved peak seroprotection rates of 95.7 percent compared with 79.5 percent for Engerix-B. Additionally, in more than 1,100 participants with diabetes, HEPLISAV-B provided seroprotection rates of 90 percent compared to 65.1 percent for Engerix-B.

147.    In the 3/30/16 Press Release, Defendant Gray commented about the filing of the Company's Revised BLA: "*another important step toward [the Company's] goal of bringing HEPLISAV-B to market to protect adults against hepatitis B.*" He further stated that the Company "*will continue to work closely with the FDA over the coming months in order to achieve HEPLISAV-B approval in the third quarter of 2016.*" (Emphasis added.)

148.    On April 18, 2016, the Company issued a press release stating that based on the HBV-23 results, HEPLISAV-B provides significantly higher rates of protection than conventional vaccine Engerix-B with fewer doses and "similar safety profile." According to the Company, "[t]he rates of local and systemic reactions, adverse events, serious adverse events, and deaths were similar between the HEPLISAV-B and Engerix-B groups. All adverse events considered to represent potential immune-mediated disorders were reviewed by an independent, blinded Safety Evaluation and Adjudication Committee and classified as not related to vaccination."

149.    The statements referenced above in ¶¶ 145-148 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to the Individual Defendants or recklessly disregarded by them: 1) HBV-23 was not properly designed to fully address the FDA's concerns and issues set forth in the 2013 CRL; 2) there were significant adverse events associated with HEPLISAV-B and with data from HBV-23 showing a numerical imbalance in cardiac adverse events; 3) Dynavax failed to provide sufficient information to the FDA in its Revised BLA to support the safety of HEPLISAV-B; 4) HEPISLAV-B's safety profile was

not similar or comparable to that of Engerix-B; and 5) a commercial launch of HEPLISAV-B was less imminent than the Company had led investors to believe, and, in fact, would ultimately be suspended.

150.     Indeed, just a week later, on April 27, 2016, Dynavax issued a press release announcing that the FDA would require additional time to complete its review of the Revised BLA (the "4/27/16 Press Release"). In the 4/27/16 Press Release, the Company disclosed that the FDA had extended the PDUFA action date for HEPLISAV-B to December 15, 2016.  As admitted by Dynavax, the additional data sets provided by Dynavax on April 8, as requested by the FDA, were the cause of the agency's decision to push back the timeline. The FDA determined that the addition of these large data sets represented a major amendment to the Revised BLA, and it had to extend the PDUFA action date to allow for a full review of the application.

151.     Without either addressing the Company's initial failure to submit sufficient data in the Revised BLA or explaining the reason why such additional data submission constituted a major amendment to the Company's Revised BLA, Defendant Gray simply stated, "We appreciate the commitment of the FDA staff to conduct a complete review of all of the data supporting our BLA and *we remain committed to working closely with them over the coming months in order to achieve HEPLISAV-B approval in 2016.*" (Emphasis added.)

152.     The 4/27/16 Press Release also stated, in relevant part:

HEPLISAV-B has a safety profile similar to that of existing vaccines. The investigational vaccine's safety profile is based on clinical trials that generated safety data from more than 10,000 HEPLISAV-B compared with more than 4000 ENGERIX-B participants. The most frequently reported local reaction was injection site pain. The most common systemic reactions were fatigue, headache and malaise.

153.     On May 9, 2016, the Company issued a press release announcing the financial results for the first quarter ended March 31, 2016 (the "5/9/16 Press Release"). In the 5/9/16 Press Release, Defendant Gray promised the investors that the Company is "*focused on working with the FDA to obtain approval of HEPLISAV-B before year end and on preparing for launch, including preparation for an advisory*

*panel in case one is called, hiring of key commercial personnel, market and pricing research and manufacturing of launch inventory.*" (Emphasis added.)

154.     The 5/9/16 Press Release also noted, "At the end of the quarter, the U.S. Food and Drug Administration (FDA) accepted for review the Biologics License Application (BLA) for HEPLISAV-B, the company's vaccine for immunization against hepatitis B infection in adults 18 years of age and older. The FDA has established December 15th as the Prescription Drug User Fee Act (PDUFA) action date for the BLA."

155.     The same day, May 9, 2016, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2016 (the "1Q 2016 10-Q"). The 1Q 2016 10-Q was signed by Defendants Gray and Ostrach.

156.     The 1Q 2016 10-Q stated the following, in relevant part:

In March 2016, the U.S. Food and Drug Administration ("FDA") accepted for review the Biologics License Application ("BLA") for HEPLISAV-B and established September 15, 2016 as the Prescription Drug User Fee Act ("PDUFA") action date. In April 2016, in response to an FDA request, Dynavax submitted individual trial data sets that had been provided as integrated data in the March 2016 BLA submission. FDA then determined that the addition of these large data sets represented a major amendment to the BLA and thus extended the PDUFA action date to December 15, 2016 to allow for a full review. The HEPLISAV-B BLA is based on the results from clinical trials that have generated data in more than 14,000 total patients. If the FDA elects to have an advisory committee meeting regarding our application, we currently anticipate the meeting likely would be in November 2016. If this timing is correct and HEPLISAV-B is approved upon completion of the review period, we expect to launch the product in the first quarter of 2017.

*We currently estimate that we have sufficient cash resources to meet our anticipated cash needs through at least the next 12 months based on cash and cash equivalents and marketable securities on hand as of March 31, 2016, and anticipated revenues and expenditures.* We expect to continue to spend substantial funds in connection with the development and manufacturing of our product candidates, particularly HEPLISAV-B and our investigational cancer immunotherapeutic product candidate, SD-101, human clinical trials for our other product candidates and additional applications and advancement of our technology. Costs relating to HBV-23 research and development expense are declining following the last subject visit in October 2015 while costs relating to seeking regulatory approval and preparing for the anticipated commercial launch of HEPLISAV-B in the United States, as well as costs related to the ongoing development of SD-101, are increasing.

(Emphasis added.)

157.    Attached to the 1Q 2016 10-Q were Sox Certifications signed by Defendants Gray and Ostrach, attesting to the accuracy of the 1Q 2016 10-Q.

158.    On June 11, 2016, Dynavax issued a press release announcing that it presented a new efficacy date on HEPLISAV-B (the "6/11/16 Press Release"). With respect to the safety of HEPLISAV-B, the Company stated, "In the total trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups. All adverse events considered to represent potential immune-mediated disorders were reviewed by an independent, blinded Safety Evaluation and Adjudication Committee, which classified these events as not related to vaccination."

159.    The 6/11/16 Press Release also stated, in relevant part:

Results showed that HEPLISAV-B provided seroprotection in 90.0 percent of participants with diabetes compared with 65.1 percent for Engerix-B - a statistically significant difference of 24.9 percent. Larger differences were observed in participants age 60 to 70, with HEPLISAV-B demonstrating an 85.8 percent rate of seroprotection compared with 58.5 percent for Engerix-B. For participants with a body mass index greater than or equal to 30, HEPLISAV-B demonstrated an 89.5 percent rate of seroprotection compared to 61.4 percent for Engerix-B.

* * *

The investigational vaccine's safety profile is based on clinical trials that generated safety data from more than 14,000 participants. The most frequently reported local reaction was injection site pain. The most common systemic reactions were fatigue, headache and malaise, all of which were similar to Engerix-B.

160.    On August 5, 2016, the Company issued a press release announcing that the FDA's VRBPAC had scheduled to review the Revised BLA for HEPLISAV-B at its meeting on November 16, 2016 (the "8/5/16 Press Release"). Defendant Gray stated in the 8/5/16 Press Release that the upcoming VRBPAC meeting "*is the next step towards our goal of obtaining regulatory approval for HEPLISAV-B and we are prepared for it.*" He further noted, "*The company looks forward to discussing HEPLISAV-B with the advisory committee and continuing to work closely with the FDA through the review process.*" (Emphasis added.)

161.    The same day, the Company also issued another press release reporting the financial results for the second quarter ended June 30, 2016 (the "8/5/16 Press Release No. 2"). The 8/5/16 Press Release No. 2 noted that the Company's "*[p]reparations for launch of HEPLISAV-B are continuing, including pre-commercial activities, manufacturing of launch inventory and continued infrastructure spending related to implementation of commercial development and information technology systems and capabilities and related increases in headcount.*" (Emphasis added.)

162.    The 8/5/16 Press Release No. 2 also noted, in relevant part:

HEPLISAV-B is an investigational adult hepatitis B vaccine that combines hepatitis B surface antigen with a proprietary Toll-like Receptor 9 agonist to enhance the immune response. HEPLISAV-B is administered in two doses over one month.

In Phase 3 trials, HEPLISAV-B demonstrated higher and earlier protection with fewer doses than a currently licensed hepatitis B vaccine. It also demonstrated a similar safety profile to the existing
vaccine.

The investigational vaccine's safety profile is based on clinical trials that generated safety data from more than 14,000 participants. The most frequently reported local reaction was injection site pain. The most common systemic reactions were fatigue, headache and malaise, all of which were similar to an existing vaccine.

163.    A few days later, on August 8, 2016, the Company filed a Form 10-Q with the SEC for the quarter ended June 30, 2016 (the "2Q 2016 10-Q"). Defendants Gray and Ostrach signed the 2Q 2016 10-Q.

164.    The 2Q 2016 10-Q stated the following, in relevant part:

In March 2016, the U.S. Food and Drug Administration ("FDA") accepted for review the Biologics License Application ("BLA") for HEPLISAV-B and established September 15, 2016 as the Prescription Drug User Fee Act ("PDUFA") action date. In April 2016, in response to an FDA request, Dynavax submitted individual trial data sets that had been provided as integrated data in the March 2016 BLA submission. The FDA then determined that the addition of these large data sets represented a major amendment to the BLA and thus extended the PDUFA action date to December 15, 2016 to allow for a full review. The HEPLISAV-B BLA is based on the results from clinical trials that have generated data in more than 14,000 patients. In August 2016 the FDA informed the Company that its Vaccines and Related Biological Products Advisory Committee ("VRBPAC") is scheduled to discuss HEPLISAV-B at its meeting on November 16, 2016. The FDA has indicated it will communicate questions for the VRBPAC to address closer in time to the meeting date.

*If this timing is correct and HEPLISAV-B is approved upon completion of the review period, we expect to launch the product in the first quarter of 2017.*

(Emphasis added.)

165.    Attached to the 2Q 2016 10-Q were Sox Certifications signed by Defendants Gray and Ostrach, attesting to the accuracy of the 2Q 2016 10-Q.

166.    The statements referenced above in ¶¶ 150-165 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following facts, which were known to the Individual Defendants or recklessly disregarded by them: 1) HBV-23 was not properly designed to fully address the FDA's concerns and issues set forth in the 2013 CRL; 2) there were significant adverse events associated with HEPLISAV-B, including a numerical imbalance in cardiac adverse events; 3) Dynavax still failed to provide sufficient information to the FDA concerning the above-mentioned adverse events even after submitting additional data sets; 4) HEPISLAV-B's safety profile was not similar or comparable to that of Engerix-B; 5) a commercial launch of HEPLISAV-B was less imminent than the Company had led investors to believe, and, in fact, would ultimately be suspended; and 6) Dynavax's resources were insufficient for the Company to advance the HEPLISAV-B program on its own if its application process were to be prolonged, which in turn would delay the process, and ultimately lead to the suspension of the manufacturing of HEPLISAV-B.

**The Truth Begins to Emerge**

167.    On September 2, 2016, the truth began to emerge when the FDA issued a public notice to cancel the previously scheduled VRBPAC meeting. The FDA's cancellation caused a sharp sell-off in Dynavax's shares as investors worried about the BLA for HEPLISAV-B and the design of the HBV-23 trial.

168.    On this news, the stock price per share of Dynavax declined from $15.94 on September 1, 2016, to close at $10.91 on September 2, 2016.

169.    To falsely assuage fears, on September 4, 2016, Dynavax issued a press release stating that the FDA would address the remaining questions "via the normal process," and Dynavax was "prepared to address those questions expeditiously in order to enable the FDA to complete its review as soon as possible" (the "9/4/16 Press Release"). The 9/4/16 Press Release stated, in relevant part:

> BERKELEY, CA -- (Marketwired) -- 09/04/16 -- Dynavax Technologies Corporation (NASDAQ: DVAX) announced today that the U.S. Food and Drug Administration's (FDA) Center for Biologics Evaluation and Research has cancelled the scheduled November 16, 2016, Vaccines and Related Biological Products Advisory Committee (VRBPAC) meeting to review the Biologics License Application (BLA) for HEPLISAV-B™ [Hepatitis B Vaccine, Recombinant (Adjuvanted)].

> During recent conversations between Dynavax and the FDA, the Agency communicated decisions to enable compliance with the current Prescription Drug User Fee Act (PDUFA) date of December 15, 2016. The Agency informed Dynavax that the VRBPAC meeting was cancelled and *remaining questions will be addressed between Dynavax and the review team via the normal process. The FDA informed Dynavax that it plans to provide information requests related to remaining questions in the upcoming weeks. Dynavax is prepared to address these questions expeditiously in order to enable the FDA to complete its review as soon as possible.*

> "*Our dialogue with the FDA has been very open and productive, and we look forward to providing the review team with any additional information they may need to complete their review*," said Eddie Gray, chief executive officer of Dynavax. "We are committed to bringing HEPLISAV-B to market as we believe it offers a better level of protection than the currently available hepatitis B vaccines."

> The FDA also confirmed to Dynavax that it will review the overall immunogenicity data from HBV-23, the company's most recent pivotal Phase 3 trial, to support the proposed indication for adults 18 years of age and over. *However, the Agency has decided it will not review immunogenicity data related to sub-populations including results in individuals with diabetes because these data were not a direct response to the FDA's February 22, 2013 Complete Response Letter and therefore fell outside of the review time allocated to a Class 2 resubmission.* Thus, it was suggested the data should be submitted as a supplemental BLA following approval.

> The FDA subsequently issued a public notice on September 2, 2016 of the decision to cancel the previously scheduled VRBPAC meeting. That notice summarized the cancellation decision, the intent to resolve outstanding questions and scheduling of a future VRBPAC meeting, if needed.

(Emphasis added.)

170.    Following this false reassurance, the company's stock price regained a portion of its loss. The Individual Defendants also were not able to hide the truth anymore. In the 9/4/16 Press Release, after receiving the FDA's public notice to cancel the VRBPAC meeting, Defendant Gray finally admitted that the Company did not submit sufficient information for the FDA to complete its review process on time. The Company acknowledged that HBV-23 was not properly designed to address the FDA's concerns and issues set forth in the 2013 CRL, and the review of the immunogenicity data related to sub-populations would require the Company and its investors to wait for an additional period of time.

171.    Despite admitting the truth that the FDA was not satisfied with the information submitted by Dynavax and that HBV-23 was improperly designed, the Company again reassured investors that the FDA was expected to complete its review by the scheduled PDUFA action date, "which remains unchanged."

172.    On October 3, 2016, the Company filed a current report on Form 8-K with the SEC announcing a regulatory update (the "10/3/16 8-K"). The 10/3/16 8-K stated the following, in relevant part:

> Dynavax Technologies Corporation ("Dynavax") received anticipated requests for information from the U.S. Food and Drug Administration's ("FDA") review team in connection with the pending Biologics License Application ("BLA") for HEPLISAV-B™ [Hepatitis B Vaccine, Recombinant (Adjuvanted)]. ***The review team's questions are in line with the company's expectations.***
>
> ***The company is working with the FDA to resolve remaining questions regarding the BLA in order to enable the FDA to complete its review by the scheduled Prescription Drug User Fee Act ("PDUFA") action date of December 15, 2016, which remains unchanged.***

(Emphasis added.)

173.    On October 26, 2016, the Company issued a press release (the "10/26/16 Press Release") titled, "Dynavax Presents Data Showing that HEPLISAV-B Provides Significantly Higher Seroprotection Rates Against Hepatitis B Infection in Populations Known to Have a Reduced Immune Response to Currently Licensed Vaccines." The 10/26/16 Press Release provided results regarding HBV-23:

***Results of New Analysis of Phase 3 Study (Poster #754)***

The pivotal Phase 3 trial, HBV-23, was a randomized, observer-blinded, active-controlled, multi-center study that compared two doses of HEPLISAV-B over four weeks with three doses of Engerix- B over 24 weeks in 8,374 adults age 18 to 70. Demographics consisting of age, sex and race were generally similar between the two treatment arms. Overall study results showing a significantly higher seroprotection rate with HEPLISAV-B versus Engerix-B (95.4 percent at week 24 vs. 81.3 percent at week 28, respectively) and comparable safety were previously reported.

The new analysis presented at IDWeek 2016 compared seroprotection rates for HEPLISAV-B with Engerix-B in subgroups of study participants by age, sex, BMI, diabetes mellitus status and smoking status. Results showed that HEPLISAV-B provided significantly higher seroprotection than Engerix-B for these subgroups of participants at increased risk of inadequate seroprotection. The largest differences were observed in study participants who were older, had diabetes, high BMI, or who smoked:

- ***Diabetes*** -- HEPLISAV-B provided seroprotection in 90.0 percent of participants compared with 65.1 percent for Engerix-B -- a statistically significant difference of 24.9 percent.
- ***Body mass index greater than or equal to 30*** -- The seroprotection rate with HEPLISAV-B was 94.7 percent compared with 75.4 percent for Engerix-B -- a statistically significant difference of 19.4 percent.
- ***Age 60 to 70*** -- HEPLISAV-B provided a 91.6 percent rate of seroprotection compared with 72.6 percent for Engerix-B -- a statistically significant difference of 19.0 percent.
- ***Smokers*** -- The seroprotection rate with HEPLISAV-B was 95.9 percent compared with 78.6 percent for Engerix-B -- a statistically significant difference of 17.3 percent.

In the total Phase 3 trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups. The most common local adverse event was injection site pain and the most common systemic adverse events were fatigue, headache and malaise. All adverse events considered to represent potential immune-mediated disorders were reviewed by an independent, blinded Safety Evaluation and Adjudication Committee (SEAC). The SEAC classified all potential immune-mediated disorders as unrelated to vaccination.

The Biologics License Application for HEPLISAV-B is currently being reviewed by the U.S. Food and Drug Administration, which has established a Prescription Drug User Fee Act (PDUFA) action date of December 15, 2016.

174.    The 10/26/16 Press Release also stated:

HEPLISAV-B is an investigational adult hepatitis B vaccine that combines hepatitis B surface antigen with a proprietary Toll-like receptor 9 agonist to enhance the immune response. HEPLISAV-B is administered in two doses over one month.

In Phase 3 trials, HEPLISAV-B demonstrated higher and earlier protection with fewer doses than a currently licensed hepatitis B vaccine. The investigational vaccine's safety

profile is based on clinical trials that generated safety data from more than 14,000 participants. The most frequently reported local reaction was injection site pain. The most common systemic reactions were fatigue, headache and malaise, all of which were similar to an existing vaccine.

175. On November 7, 2016, the Company issued a press release (the "11/7/16 Press Release") announcing its financial results for the fiscal quarter ended September 30, 2016. With regard to recent progress, the 11/7/16 Press Release stated, in relevant part:

> **HEPLISAV-B.** In late August, the U.S. Food and Drug Administration (FDA) cancelled its previously scheduled Vaccines and Related Biological Products Advisory Committee (VRBPAC) meeting to review the Biologics License Application (BLA) for HEPLISAV-B™ [Hepatitis B Vaccine, Recombinant (Adjuvanted)]. The FDA indicated that remaining questions on the BLA will be addressed between Dynavax and the FDA review team. The Company has since provided responses to information requests by the FDA related to remaining questions. The FDA also confirmed in August that it will not include in its review of the BLA the immunogenicity data submitted by the Company related to sub-populations, including results in individuals with diabetes. The Company plans to submit these data as a supplemental BLA.

> The Prescription Drug User Fee Act (PDUFA) date for the HEPLISAV-B BLA is December 15, 2016.

> In late October, we reported sub-group results from HBV-23, demonstrating that HEPLISAV-B, when administered as two doses over one month, induced significantly higher seroprotection rates than the approved hepatitis B vaccine Engerix-B®, when administered as three doses over six months. This result was observed in all prespecified groups of study participants, including those with characteristics that are known to have a reduced immune response to currently licensed hepatitis B vaccines, including older age, high body mass index, diabetes mellitus, male gender and persons who smoke. In the total Phase 3 trial population, the rates of adverse events, serious adverse events and deaths were similar between the HEPLISAV-B and Engerix-B groups. The data were presented at the Infectious Diseases Society of America's (IDSA) annual IDWeek 2016 meeting in New Orleans.

> Preparations for launch of HEPLISAV-B are continuing, including pre-commercial activities, manufacturing of launch inventory and continued infrastructure spending related to commercial development and information technology capabilities and related increases in headcount.

176. On November 7, 2016, the Company filed a Form 10-Q with the SEC for the quarter ended September 30, 2016 (the "3Q 2016 10-Q"). Defendants Gray and Ostrach signed the 3Q 2016 10-Q.

177.    The 3Q 2016 10-Q commented on the Company's entering into a Note Purchase

Agreement, stating, in relevant part:

> On October 26, 2016, Dynavax entered into a **Note Purchase Agreement** (the "Note Purchase Agreement") with one or more funds of Deerfield Management Company, L.P. (collectively, the "Purchasers") and one such fund, as collateral agent, pursuant to which the Company agreed to sell, and the Purchasers agreed to purchase, an aggregate of $100.0 million principal amount of the Company's senior secured notes (the "Notes") for an aggregate purchase price of $100.0 million. ***The closing of the sale and purchase of the Notes is expected to occur after the Company receives U.S. Food and Drug Administration ("FDA") approval for the sale and marketing of HEPLISAV-B and certain other closing conditions are satisfied (the date of such closing, the "Purchase Date"). The Company expects to use the proceeds of the Notes for general corporate purposes, including the commercialization of HEPLISAV-B.*** The outstanding principal amount of the Notes will accrue interest at a rate equal to 10.375% per annum. The Notes will mature on the fifth anniversary of the Purchase Date, unless earlier prepaid or repurchased. The Company's obligations under the Notes and the Note Purchase Agreement will be required to be guaranteed by certain of the Company's future subsidiaries and will be secured by a perfected security interest in substantially all of the assets of the Company and any future subsidiary guarantors, subject to customary permitted liens and other agreed upon exceptions.
>
> In March 2016, the FDA accepted for review the Biologics License Application ("BLA") for HEPLISAV-B. ***The Prescription Drug User Fee Act ("PDUFA") action date is December 15, 2016. We are working with the FDA to resolve remaining questions regarding the BLA in order to enable the FDA to complete its review by the PDUFA action date. If HEPLISAV-B is approved by the scheduled PDUFA action date of December 15, 2016, we expect to launch the product in the first quarter of 2017.***

(Emphasis added.)

178.    Attached to the 3Q 2016 10-Q were Sox Certifications signed by Defendants Gray and

Ostrach, attesting to the accuracy of the 3Q 2016 10-Q.

179.    The statements referenced above in ¶¶ 169-178 were materially false and misleading at the

time they were made because they misrepresented and failed to disclose the following facts, which were

known to the Individual Defendants or recklessly disregarded by them: 1) there were significant adverse

events associated with HEPLISAV-B and with data from HBV-23 showing a numerical imbalance in

cardiac adverse events; 2) a commercial launch of HEPLISAV-B was less imminent than the Company

had led investors to believe, and, in fact, would ultimately be suspended; 3) HEPISLAV-B's safety profile

was not similar or comparable to that of Engerix-B; and 4) Dynavax's resources were insufficient for the Company to advance the HEPLISAV-B program on its own if its application process were to be prolonged, which in turn would delay the process, and ultimately lead to the suspension of the manufacturing of HEPLISAV-B.

### The Truth Fully Emerges

180.    On November 14, 2016, Dynavax issued a press release announcing that the Company had received another CRL from the FDA for the Revised BLA for HEPLISAV-B (the "11/14/16 Press Release"). The Company attributed the 2016 CRL, in part, to the FDA's inability to assess the responses Dynavax provided in early October and pointed out that the 2016 CRL did not request additional clinical trials or express concerns with rare serious autoimmune events. These positives from the 2016 CRL, however, were offset by the need to put additional time and resources in the program, and a further delay of the commercialization of HEPLISAV-B. Defendant Gray noted in the 11/14/16 Press Release that "***the time and resources that will be required to gain approval leads us to consider that we may not be able to advance this program on our own and we are moving swiftly to identify a potential pharmaceutical or financial partner.***" (Emphasis added.)

181.    The 11/14/16 Press Release stated in relevant part:

BERKELEY, CA -- (Marketwired) -- 11/14/16 -- Dynavax Technologies Corporation (NASDAQ: DVAX) today announced that it has received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding its Biologics License Application (BLA) for HEPLISAV-B™ [Hepatitis B Vaccine, Recombinant (Adjuvanted)] for immunization of adults 18 years and older against hepatitis B infection. The FDA issues CRLs to communicate that the Agency has completed a review cycle of an application and to request additional information for review and approval. Dynavax expects a Class 2 designation for a resubmission of the BLA, which would result in a target review period of six months.

***The CRL seeks information regarding several topics, including clarification regarding specific adverse events of special interest (AESIs), a numerical imbalance in a small number of cardiac events in a single study (HBV-23), new analyses of the integrated safety data base across different time periods, and post-marketing commitments. In the CRL, the FDA acknowledged that it has not yet completed its review of responses received from Dynavax in early October, including those pertaining to AESIs and the***

*numerical imbalance in cardiac events. The responses included an extensive analysis that included independent expert consultation supporting our view that the imbalance was driven by an unexpectedly low number of events in the comparator arm. It would appear the Agency could not fully assess the responses in the current review period. In the CRL, there is no request for additional clinical trials and there are no apparent concerns with rare serious autoimmune events.*

"The CRL is consistent with our opinion that HEPLISAV-B is approvable and we are seeking to meet with the FDA as soon as possible," said Eddie Gray, chief executive officer of Dynavax. "*However, the time and resources that will be required to gain approval leads us to consider that we may not be able to advance this program on our own and we are moving swiftly to identify a potential pharmaceutical or financial partner.* We will maintain our efforts on the oncology programs, including our lead cancer immunotherapy candidate, SD-101, for which we recently announced encouraging early clinical data in metastatic melanoma."

(Emphasis added.)

182.    Also on November 14, 2016, the Company held an investors conference call, where an analyst for RBC Capital Markets, Simos Simeonidis, asked for more details concerning Dynavax's belated disclosure of cardiac events during HBV-23:

In terms of the cardiac events that you are mentioning in the press release and I guess a big part of the CRL, were you surprised this was a focus of the -- for the FDA? Can you tell us what kind of events these were? Were these MIs or pulmonary embolisms for example? And what kind of imbalance are we talking about? I don't know if you want to give the numbers or can you talk about the fold? Is it like a 2 versus 1 or was it like an 8 versus 1, something that was more significant?

183.    In response, Defendant Gray refused to provide any additional detail, and stated, in relevant part:

So we are not going to go into any more detail than we have given because obviously we now want to get into conversations with partners about all of the data including the context of that. We have been imbalance in a single term which the agency referred to as cardiac events and so we have utilized their language in our communication of it. And we simply don't want discussion of individual numbers which are not representative of the story whilst we try to have those conversations.

184.    Defendant Gray was then asked a follow up question by the same analyst with regard to the lack of transparency on the cardiac events that occurred during HBV-23:

But aren't you concerned that by not having more transparency as to what these events are, the imbalance, that is going to continue to be an issue for investors that there is something

out there that they don't know about the significance of it, the impact of it and for the next nine, 10 months or a year, analysts and investors won't know what the major issue is?

185.    Defendant Gray again refused to disclose further information, replying:

No, I mean I think there is always a sort of cutoff point in what is reported and you and I both know as does everybody on the line that the sort of general convention is that it would not be normal practice to talk about numeric imbalances unless it reaches some degree of statistical significance or it perhaps you feel there is a good reason to believe that there might be a relationship. This situation meets neither of those criteria and I think I will ask Rob as our Chief Medical Officer who has lived with this data for the last year to give you his assurance of our confidence in this position.

186.    Defendant Janssen also stated in response:

So I led the team that did all the analyses and wrote the BLA and responses to the information requests and actually did many of the analyses myself, wrote the response to the information requests. We did seek external consultation from very highly regarded external experts. And all of this expanded work I think just continued to convince me that there is no relationship between the cardiac events and the vaccine and in fact is due to an unexpectedly low rate in the Engerix arm.

187.    Later the same day, Simos Simeonidis, on behalf of RBC Capital Markets, issued a report

that stated, "we were surprised to see for the first time the disclosure of cardiac events imbalance in HBV-

23 given as one of the reasons for the CRL, in addition to the agency's known concerns about AESIs."

The report continued:

AESIs have been a known area of concern for the agency and this is something investors have had the opportunity to investigate. The imbalance in cardiac events is something we're seeing disclosed for the first time by Dynavax, which is surprising, given that 1) cardiac events definitely fall within the more "serious" safety concern category in drug development; and 2) the company had recently disclosed that the questions it had received from FDA were "in line with expectations." An imbalance in cardiac events in Phase III that would be significant enough to be of concern to FDA  as definitely not among the expectations that investors have had for this trial and for this program.

188.    In reaction to the Company's disclosures, another analyst, Anupam Rama of JPMorgan,

stated the following with regard to the regulatory risk:

This morning, Dynavax announced that the FDA has issued another Complete Response Letter (CRL) for Heplisav Hepatitis B vaccine. When we downgraded DVAX shares in April, regulatory risk / uncertainty was a central component to the thesis (along with market concerns). Indeed, the FDA appears to have several outstanding questions regarding the filing, and today a numerical imbalance in cardiac events was also highlighted (nature of

events unknown). Of note, no additional trials have been requested, and Dynavax will work to submit answers to the FDA's questions (timeframe unknown). Further, the company will now be looking for a partner to help offset costs of getting Heplisav across the goal-line. However, given the uncertainty that surrounds this most recent round of review, the likelihood of a potential partnership is unclear in the near term, in our view. Net-net, given ongoing uncertainty for Heplisav and the early-stage of the company's oncology asset SD-101, we are reiterating our Neutral rating on DVAX shares but withdrawing our December 2017 price target due to an uncertain path forward and economics related to Heplisav.

189.   Upon this news, Dynavax's share price fell $7.05, or 64.65%, to close at $4.10 on November 14, 2016.

190.   An analyst report by Katerine Xu of William Blair issued on November 15, 2016 further revealed the investing public's concern with Dynavax's disclosures.  Her report stated that "[a]mong the additional information the FDA requested, the disclosure of the numerical imbalance of cardiovascular event was news to us."  She stated to investors that, based on the Company's disclosures, "The fastest timeline for a potential approval, if any, would be about nine months from now, by our estimation." Further, she stated:

> ***Possible scenarios going forward.*** As discussed above, it is possible that Heplisav garners approval based on the company's response to the second CRL in late 2017. It is also possible that the FDA calls for a panel to discuss the cardiac events if it deems necessary, in which case a final approval, if any, could be further delayed. Another possibility is that the FDA asks for another study to assess the incidence of the cardiac events, which we believe is not quite as likely.

191.   Subsequently, on December 23, 2016, the Company filed a current report on Form 8-K with the SEC disclosing that, on December 20, 2016, the $100 million loan agreement it entered into for the purpose of financing the commercialization of HEPLISAV-B had been terminated because the closing could not occur without FDA approval. The Company paid a prepayment fee totaling $1.5 million to terminate the Agreement, which would have been avoided had the Individual Defendants not breached their fiduciary duties.

192.   The Company announced in a Form 8-K/A filed with the SEC on January 13, 2017 that it had suspended manufacturing of HEPLISAV-B and reduced its global workforce by 38 percent to achieve

"cost reductions." The restructuring costs, which were related to one-time employee termination benefits, would be $3 million.

193.   On March 13, 2017, the Company issued a press release in which it stated, with regard to the Company's operations and the future of HEPLISAV-B:

> As part of the January restructuring, the company suspended manufacturing activities, commercial preparations and other longer term investment related to HEPLISAV-B during the regulatory review period and reduced its global workforce by approximately 40%. If the product is approved, Dynavax plans to satisfy anticipated initial demand from existing stockpiled inventory and to scale up commercial activities based on market demand and investment priorities.

**Summary of Defendants' Misconduct**

194.   In breach of their fiduciary duties, the Individual Defendants recklessly managed the Company by conducting a clinical trial that was improperly designed and caused the Company to provide incomplete information to the FDA, which resulted in the delay and ultimate suspension of the commercialization of the Company's lead product HEPLISAV and, as subsequently referred to, HEPLISAV-B.

195.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

196.   In breach of their fiduciary duties owed to Dynavax, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact to the investing public concerning the Company's regulatory approval process and commercial-readiness for "HEPLISAV-B." Specifically, the Individual Defendants failed to disclose that: 1) HBV-23 was not properly designed to fully address the FDA's concerns and issues set forth in the 2013 CRL; 2) there were significant adverse events associated with HEPLISAV-B and with data from HBV-23 showing a numerical imbalance in cardiac adverse events; 3) Dynavax failed to provide sufficient information to the FDA concerning specific adverse events of special interest, the numerical imbalance in

a small number of cardiac events in HBV-23, new analyses of the integrated safety data base across different time periods, and post-marketing commitments; 4) a commercial launch of HEPLISAV-B was less imminent than the Company had led investors to believe, and, in fact, would ultimately be suspended; 5) HEPISLAV-B's safety profile was not similar or comparable to that of Engerix-B; 6) Dynavax's resources will not be sufficient for the Company to advance the HEPLISAV-B program on its own if its application process were to be prolonged, which in turn would delay the process, and ultimately lead to the suspension of the manufacturing of HEPLISAV-B; and 7) the Company failed to maintain internal controls.

## DAMAGES TO DYNAVAX

197.    As a direct and proximate result of the Individual Defendants' conduct, Dynavax will lose and expend many millions of dollars.

198.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

199.    Such costs include, but are not limited to the costs incurred from implementing improperly designed clinical trial and prolonging the vaccine approval process.

200.    Such costs include the $1.5 million loan termination fee.

201.    Such costs include the $3.0 million restructuring costs related to one-time employee termination benefits, and the termination of 38% of the Company's employees.

202.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain goals, which the Company misrepresented that it met, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

203.    As a direct and proximate result of the Individual Defendants' conduct, Dynavax has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

204.    Plaintiff brings this action derivatively and for the benefit of Dynavax to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Dynavax, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

205.    Dynavax is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

206.    Plaintiff is, and has been since before the beginning of the Relevant Period, a shareholder of Dynavax.  Plaintiff will adequately and fairly represent the interests of Dynavax in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

207.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

208.    A pre-suit demand on the Board of Dynavax is futile and, therefore, excused.  At the time of the initial filing of this action, the Board consists of the following nine Individual Defendants: Defendants Oronsky, Brege, Cano, Carson, Gray, Kisner, Phillips, Plotkin, and Ricciardi (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to five of the nine directors that were on the Board at the time this action was commenced.

209.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to conduct an improperly designed clinical trial, to submit incomplete information to the FDA, and to make false and misleading statements and omissions of material facts, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

210.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the conduct alleged herein.  The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

211.   Additional reasons that demand on Defendant Gray is futile follow.  Defendant Gray was a Company director at all relevant times and is the Company's Chief Executive Officer, and is thus, as the Company admits, a non-independent director. Indeed, Defendant Gray receives millions of dollars in compensation from the Company annually. For example, Defendant Gray received a total compensation of $2,947,840 for 2016. Defendant Gray was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed, and those contained in the press releases, and including many of which he personally made.   His large Company stock holding, worth approximately $6.8 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Gray is a defendant in the Securities Class Action.  As the Company's top officer and as a trusted Company director, he conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously

disregarded his duties to protect corporate assets.  For these reasons, too, Defendant Gray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Plotkin is futile follow. Defendant Plotkin's Company stock holding, worth about $271,013 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. Defendant Plotkin received a large amount of compensation from the Company in 2016, which was about $110,692 in total.  In addition, Defendant Plotkin was aware of the deficiencies in the Company's HBV-23 trial and the Revised BLA because he had extensive previous experience conducting research regarding vaccines, undergoing clinical trials, and preparing for the commercial launch of vaccine products. Defendant Plotkin researched and worked in the vaccine developing industry for decades as a Professor of Virology at the Wistar Institute and Professor of Pediatrics and Microbiology at the University of Pennsylvania until 1991. Subsequently, Defendant Plotkin joined the vaccine manufacturer Sanofi Pasteur and served as Medical and Scientific Director and Executive Advisor. He had worked for various hospitals, had been chairman of the Infectious Diseases Committee and the AIDS Task Force of the American Academy of Pediatrics, liaison member of the Advisory Committee on Immunization Practices and Chairman of the Microbiology and Infectious Diseases Research Committee of the National Institutes of Health. Defendant Plotkin had significant experience in developing and manufacturing vaccines, and he cannot claim ignorance to the safety issues caused by HEPLISAV-B. He should have advised the Company to conduct a better designed trial and to provide sufficient information to the FDA to support a thorough review of HEPLISAV-B. However, as a trusted director, Defendant Plotkin conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, including the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect

corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K that is referenced herein.  For these reasons, too, Defendant Plotkin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Oronsky is futile follow. Defendant Oronsky has been a member of the Board since November 1996 and became Chairman of the Board in February 2006. Defendant Oronsky received a large amount of compensation from the Company in 2016, which was about $143,192 in total. Also, Defendant Oronsky's Company stock holding, worth about $1,174,532 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. In addition, Defendant Oronsky was aware of the deficiencies in the Company's HBV-23 trial and the Revised BLA because he had extensive previous experience conducting research regarding vaccines, undergoing clinical trials, and preparing for the commercial launch of vaccine products. Defendant Oronsky had worked in the vaccine developing industry since at least 1973 when he was head of the inflammation, allergy and immunology research program at Ciba-Geigy Pharmaceutical Company. He also served as a senior lecturer in the Department of Medicine at The Johns Hopkins Medical School and had published over 125 scientific articles. He worked with various biopharmaceutical companies, such as Tesaro, Inc. and Applied Genetic Technologies Corporation. Thus, with extensive experiences in developing and manufacturing vaccines, Defendant Oronsky cannot claim ignorance to the safety issues caused by HEPLISAV-B and should have advised the Company to conduct a better designed trial and to provide sufficient information to the FDA to support a thorough review of HEPLISAV-B. However, as a trusted director, the Chairman of the Board, and a member of the Audit Committee, Defendant Oronsky conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes described herein,

including the false and misleading statements, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K that is referenced herein. For these reasons, too, Defendant Oronsky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.   Additional reasons that demand on Defendant Brege is futile follow. Defendant Brege has been a member of the Board since February 2015. She is the Chairperson of the Audit Committee. Defendant Brege received a large amount of compensation from the Company in 2016, which was about $130,692 in total. Defendant Brege was aware of the deficiencies in the Company's HBV-23 trial and the Revised BLA both because she is the Chairperson of the Audit Committee, and because she had extensive previous experience conducting research regarding vaccines, undergoing clinical trials, and preparing for the commercial launch of vaccine products. Defendant Brege had worked in the management role of pharmaceutical, biopharmaceutical and biotechnology companies for over 20 years. She led multiple functions of the companies include commercialization, strategic planning, medical, scientific, corporate development and government affairs. Thus, with extensive experience in developing and commercializing biopharmaceutical products, Defendant Brege cannot claim ignorance to the safety issues caused by HEPLISAV-B and should have advised the Company to conduct a better designed trial and to provide sufficient information to the FDA to support a thorough review of HEPLISAV-B. However, as a trusted director, the Chairperson of the Audit Committee, Defendant Brege conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, including the false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, she signed, and thus personally made, the false and misleading statements in the 2015 10-K that is referenced herein. For these reasons,

too, Defendant Brege breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Cano is futile follow. Defendant Cano has been a Board member since November 2009. Defendant Cano is a member of the Compensation Committee and the Nominating and Governance Committee. Defendant Cano received a large amount of compensation from the Company in 2016, which was about $122,692 in total. Also, Defendant Cano's Company stock holding, worth about $360,146 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. In addition, Defendant Cano was aware of the deficiencies in the Company's HBV-23 trial and the Revised BLA because he had extensive previous experience conducting research regarding vaccines, undergoing clinical trials, and preparing for the commercial launch of vaccine products. Defendant Cano had worked in the vaccine developing industry for decades. He had been President and Founder of Cano Biotech Corp., a consulting firm focusing on the vaccine business, since 1996 and had worked with many companies in the business, including Aviron and the Lederle Laboratories Division of American Cyanamid. Thus, with significant experience as a founder of and advisor to established vaccine businesses, Defendant Cano cannot claim ignorance to the safety issues caused by HEPLISAV-B and should have advised the Company to conduct a better designed trial and to provide sufficient information to the FDA to support a thorough review of HEPLISAV-B. However, as a trusted director, a member of the Compensation Committee and the Nominating and Governance Committee, Defendant Cano conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, including the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K that is referenced herein.  For these reasons, too, Defendant Cano breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.   Additional reasons that demand on Defendant Carson is futile follow. Defendant Carson has been a Board member since December 1997. Defendant Carson received a large amount of compensation from the Company in 2016, which was about $110,692 in total. Also, Defendant Carson's Company stock holding, worth about $435,114 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. In addition, Defendant Carson was aware of the deficiencies in the Company's HBV-23 trial and the Revised BLA because he had extensive previous experience conducting research regarding vaccines, undergoing clinical trials, and preparing for the commercial launch of vaccine products. Defendant Carson is a noted researcher in the fields of autoimmune and immunodeficiency diseases. He has played key roles in the founding of Vical, Inc., a gene therapy company, IDEC Pharmaceuticals, a biopharmaceutical company, and Triangle Pharmaceuticals, a pharmaceutical company. Thus, with significant experience in research and development of vaccines, Defendant Carson cannot claim ignorance to the safety issues caused by HEPLISAV-B and should have advised the Company to conduct a better designed trial and to provide sufficient information to the FDA to support a thorough review of HEPLISAV-B. However, as a trusted director, Defendant Carson conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, including the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K that is referenced herein.  For these reasons, too, Defendant Carson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.     Additional reasons that demand on Defendant Kisner is futile follow. Defendant Kisner has been a Board member since July 2010. Defendant Kisner is the Chairperson of the Nominating and Governance Committee and a member of the Compensation Committee. Defendant Kisner received a large amount of compensation from the Company in 2016, which was about $127,692 in total. Also, Defendant Kisner's Company stock holding, worth about $222,832 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. In addition, Defendant Kisner was aware of the deficiencies in the Company's HBV-23 trial and the Revised BLA because he had extensive previous experience conducting research regarding vaccines, undergoing clinical trials, and preparing for the commercial launch of vaccine products. Defendant Kisner worked in the vaccine developing industry for decades with Isis Pharmaceuticals, Inc., Abbott Laboratories, SmithKline Beecham Pharmaceuticals, Conatus Pharmaceuticals, Inc., Lpath, Inc., and Zynerba Pharmaceuticals. Thus, with significant experience in the vaccine developing industry, Defendant Kisner cannot claim ignorance to the safety issues caused by HEPLISAV-B and should have advised the Company to conduct a better designed trial and to provide sufficient information to the FDA to support a thorough review of HEPLISAV-B. However, as a trusted director, the Chairperson of the Nominating and Governance Committee and a member of the Compensation Committee, Defendant Kisner conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, including the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K that is referenced herein.  For these reasons, too, Defendant Kisner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Phillips is futile follow. Defendant Phillips has been a Board member since August 2006. Defendant Phillips is the Chairperson of the Compensation Committee and a member of the Audit Committee. Defendant Phillips received a large amount of compensation from the Company in 2016, which was about $133,192 in total. Also, Defendant Phillips's Company stock holding, worth about $621,570 before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible. In addition, Defendant Phillips was aware of the deficiencies in the Company's HBV-23 trial and the Revised BLA because she had extensive previous experience conducting research regarding vaccines, undergoing clinical trials, and preparing for the commercial launch of vaccine products. Defendant Phillips worked in the vaccine developing industry for decades with Tekmira Pharmaceuticals, Portola Pharmaceuticals, Immunex Corporation. During her career at Immunex, she held positions of increasing responsibility in research, development, manufacturing, sales and marketing. As Senior Vice President for Pharmaceutical Development and General Manager for Enbrel® from 1994 until 1998, she was responsible for clinical development and regulatory affairs as well as the launch, sales and marketing of the product. Thus, with significant experience in development and commercialization of vaccines, Defendant Phillips cannot claim ignorance to the safety issues caused by HEPLISAV-B and should have advised the Company to conduct a better designed trial and to provide sufficient information to the FDA to support a thorough review of HEPLISAV-B. However, as a trusted director, the Chairperson of the Compensation Committee and a member of the Audit Committee, Defendant Phillips conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, including the false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets.  Moreover, she signed, and thus personally made, the false and misleading statements in the 2015 10-K that is referenced herein.  For these reasons, too,

Defendant Phillips breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

219.    Additional reasons that demand on Defendant Ricciardi is futile follow. Defendant Ricciardi has been a Board member since June 2013. Defendant Ricciardi is a member of the Nominating and Governance Committee. Defendant Ricciardi received a large amount of compensation from the Company in 2016, which was about $115,692 in total. During the Relevant Period, Defendant Ricciardi was aware of the deficiencies in the Company's HBV-23 trial and the Revised BLA because he had extensive previous experience conducting research regarding vaccines, undergoing clinical trials, and preparing for the commercial launch of vaccine products. Defendant Ricciardi spent his entire 39-year career at Pfizer Inc., a biopharmaceutical company, holding the positions of President, Pfizer Global Manufacturing, and Senior Vice President of Pfizer Inc. He was directly responsible for all of Pfizer's internal and external supply organization, which supplies vaccines and pharmaceuticals. Thus, with significant experience in the vaccine developing industry, Defendant Ricciardi cannot claim ignorance to the safety issues caused by HEPLISAV-B and should have advised the Company to conduct a better designed trial and to provide sufficient information to the FDA to support a thorough review of HEPLISAV-B. However, as a trusted director, the Chairperson of the Nominating and Governance Committee and a member of the Compensation Committee, Defendant Ricciardi conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, including the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K that is referenced herein.  For these reasons, too, Defendant Ricciardi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  Thus, each member of the Board is not disinterested or independent, faces a substantial likelihood of liability, and, thus, demand on each Director would have been futile, and is thus excused.

221.    The Directors, as members of the Board, were and are subject to the Company's Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

222.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Directors would be futile.

223.    Moreover, Individual Defendants Oronsky, Cano, Carson, Gray, Kisner, Phillips, Plotkin, and Ricciardi were aware of, and permitted, the Company's ineffective internal controls as they were all members of the Board in 2013 when the Company was subject to a consolidated securities class action lawsuit filed in the United States District Court for the Northern District of California, captioned *In re Dynavax Technologies Corporation Securities Litigation*, Case No. 3:13-cv-02796, which alleged, among other things, that the Company failed to disclose material adverse information and misrepresented the

truth about the Company's disclosure controls and procedures.  Thus, these Directors face a substantial likelihood of liability, and any demand on them would be futile.

224.   The Directors, due to their specific expertise and experience, were especially knowledgeable about the development of HEPLISAV and path through the FDA approval process. Moreover, Defendants Plotkin, Cano, Oronsky, Phillips, Kisner, and Carson each have extensive previous experience conducting clinical trials and researching vaccines, and have all previously worked with the FDA to approve new drug products.  Thus, these Directors face a substantial likelihood of liability, and any demand on them would be futile.

225.   Defendants Oronsky, Carson, Phillips, and Plotkin approved Dyanavax's revised Phase III clinical trial plan in 2009 and were tasked with regularly reviewing the risk that HEPLISAV would not gain FDA approval.  As a result, these Directors were especially aware of the significant design flaws of HEPLISAV's Phase 3 clinical trials, and any demand on them would be futile.

226.   Dynavax has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Dynavax any part of the damages Dynavax suffered and will continue to suffer thereby.  Thus, any demand on the Directors would be futile.

227.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about

whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

228.    The acts complained of herein constitute violations of fiduciary duties owed by Dynavax's officers and directors, and these acts are incapable of ratification.

229.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Dynavax.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Dynavax, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

230.    If there is no directors' and officers' liability insurance, then the Directors will not cause Dynavax to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

231.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

232.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Dynavax's business and affairs.

234.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

235.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Dynavax.

236.    In In breach of their fiduciary duties owed to Dynavax, the Individual Defendants intentionally or recklessly mismanaged the Company, causing it to implement an improperly designed clinical trial and to provide incomplete information to the FDA, which led to the delay of the approval process

237.    In further breach of their fiduciary duties owed to Dynavax, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and omissions of material fact.  The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

238.    Moreover, the Individual Defendants breached their fiduciary duties by failing to maintain internal controls.

Verified Shareholder Derivative Complaint

239.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Dynavax's securities.

240.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Dynavax's securities.

241.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

242.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Dynavax has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

243.   Plaintiff on behalf of Dynavax has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

244.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Dynavax.

246.    The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Dynavax that was tied to the performance or artificially inflated valuation of Dynavax, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

247.    Plaintiff, as a shareholder and a representative of Dynavax, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits–including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

248.    Plaintiff on behalf of Dynavax has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

249.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Dynavax, for which they are legally responsible.

251.    As a direct and proximate result of the Individual Defendants' abuse of control, Dynavax has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Dynavax has sustained and continues to

sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252.    Plaintiff on behalf of Dynavax has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

253.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Dynavax in a manner consistent with the operations of a publicly-held corporation.

255.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Dynavax has sustained and will continue to sustain significant damages.

256.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

257.    Plaintiff, on behalf of Dynavax, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

258.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Dynavax to waste valuable corporate assets by failing to disclose certain risks that impacted the Company's bottom line as alleged

herein, by causing the Company to pay the loan agreement termination fee, and by causing the Company to incur $3 million in restructuring costs.

260.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

261.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

262.    Plaintiff on behalf of Dynavax has no adequate remedy at law.

**<u>PRAYER FOR RELIEF</u>**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Dynavax, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Dynavax;

(c)    Determining and awarding to Dynavax the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Dynavax and the Individual Defendants to take all necessary actions to reform and improve Dyanavax's corporate governance and internal procedures to comply with applicable laws and to protect Dynavax and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be

necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of Dynavax to nominate at least five candidates for election to the board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)      Awarding Dynavax restitution from Individual Defendants, and each of them;

      (f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)      Granting such other and further relief as the Court may deem just and proper.

Dated: November 30, 2017      Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
By: /s/   Robert C. Moest_____
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Michael Shumake, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of November, 2017.

Michael Shumake